UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOHN CASCIANI,

                              Plaintiff,

                                                        <u>DECISION AND ORDER</u>

                                                        08-CV-6162L

                    v.

RONALD NESBITT, Town Board Supervisor,
In his Individual and Official capacity,
TOWN OF WEBSTER,

                              Defendants.
_____


        Plaintiff, John Casciani, commenced this action under 42 U.S.C. § 1983 against

defendants the Town of Webster, New York ("the Town") and Webster Town Board Supervisor

Ronald Nesbitt, alleging that defendants violated plaintiff's rights under the First and Fourteenth

Amendments to the United States Constitution.  Specifically, this action arises out of defendants'

enactment of an ordinance ("the ordinance") prohibiting any private aircraft from taking off or

landing anywhere within Webster, a suburb of Rochester, N.Y.  Plaintiff is a Webster resident

who owns a helicopter that he has, in the past, flown from and to a landing pad that he has

constructed on his property.

Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. #10). Plaintiff has cross-moved to amend his complaint pursuant to Rule 15(a) (Dkt. #13).

On April 17, 2009, the Court issued an order ("Rule 12(d) Order") (Dkt. #21) notifying the parties of the Court's intention to convert defendants' motion to dismiss to a Rule 56 motion for summary judgment, under Rule 12(d) of the Federal Rules of Civil Procedure. Pursuant to that order, the parties have submitted additional evidence and other papers. *See* Dkt. ##22-28.

Having reviewed all the motion papers and the evidence before me, I conclude that defendants are entitled to summary judgment. Defendants' motion is therefore granted, plaintiff's cross-motion to amend his complaint is denied, and the complaint is dismissed.

## BACKGROUND

In 2003, plaintiff purchased a helicopter for his personal use. To accommodate that use, plaintiff constructed a fourteen-square-foot concrete landing pad on his residential property in Webster.

When plaintiff bought and began flying his helicopter, the Town of Webster Code contained no provisions expressly dealing with private aviation or private airports within the Town. A state statute, however, New York General Business Law § 249, did provide in part that "[n]o person shall ... establish a privately-owned airport ... except by authorization of the governing body of the city, village or town in which such airport or any part thereof is proposed to be established or improved." For purposes of the statute, an "airport" is "any locality ... which

is used or intended to be used for the landing and take-off of aircraft ... ." *See* N.Y. Gen. Bus. L. § 240(4), (5) (incorporated by reference in § 249).

Plaintiff alleges that shortly after he began operating his helicopter on his property, George Winter, the Town's code enforcement officer, cited plaintiff for over a dozen code violations, mostly for matters that were not directly or explicitly related to plaintiff's helicopter, such as having unregistered motor vehicles parked on his property. Plaintiff alleges that other, similarly situated Webster residents were not so charged. According to plaintiff, the purpose of the citations was to harass him because of plaintiff's continued use of his helicopter.

Plaintiff alleges that in November 2004, the Town's attorney, Charles Genese, asked plaintiff to "come down and make [the use of his helicopter] legal," apparently meaning that plaintiff should seek the Town's authorization to operate a private airport under § 249. Amended Complaint ¶ 34. Although plaintiff asserted that he was in compliance with all applicable laws, Genese responded that some Town officials disagreed, and he again asked plaintiff to attend an upcoming Town Board meeting to "make it legal." Amended Complaint ¶ 39.

Plaintiff did attend a meeting of the Town Board in January 2005. In advance of the meeting, plaintiff prepared a "heliport proposal," which he describes as "an extremely supportive document regarding Plaintiff's use of his helicopter on his personal land." Amended Complaint ¶ 47. The proposal included letters from some of plaintiff's neighbors, as well as the local fire, police and highway departments, "all attesting to the benefits of the helicopter." Amended Complaint ¶ 48.

At the meeting, plaintiff distributed copies of his proposal to the Board members. Plaintiff alleges, however, that after publicly "humiliating, ridiculing, harassing and belittling"

3

plaintiff for two and a half hours, then-Town Supervisor Cathryn Thomas declared that a public hearing would be held, at a local auditorium, for the express purpose of addressing plaintiff's operation of his helicopter. Amended Complaint ¶ 52.

Subsequent to the January meeting, Genese spoke again with plaintiff, and allegedly asked plaintiff to "withdraw [Plaintiff's] application [under § 249]." Amended Complaint ¶ 53. Since that appears to be the first mention made in the complaint of any such application, it is not clear if that was a reference to plaintiff's "heliport proposal," or if plaintiff had previously submitted a formal application for authorization of an "airport" pursuant to § 249.

In any event, Genese allegedly told plaintiff that the Town was preparing to draft an ordinance of some kind regulating the operation of private aircraft within Webster, but he assured plaintiff that plaintiff would be "grandfathered in," and that plaintiff would be allowed to continue flying his helicopter. Based on Genese's assurances, plaintiff withdrew his application.

The Town then formed a committee to establish zoning laws regulating the use of private aircraft and airports within Webster. For the next year, while the zoning law committee was drafting the proposed regulations, plaintiff continued to fly his helicopter as before, and, according to him, he continued to be harassed as before through the Town's selective enforcement of various property ordinances.

In February 2006, defendants completed a proposed ordinance concerning private aircraft and airports within Webster. As then drafted, the proposed ordinance provided for the creation of restricted districts within which aircraft could operate, for special use permits, and for variances with respect to aircraft use. *See* Pl. App. vol. I, Ex. R. Public notice of the proposed ordinance was given and a public hearing was scheduled for March 2, 2006.

Plaintiff and his then-attorney attended the hearing, and voiced their opposition to the proposed ordinance. Although the proposed ordinance would have allowed for private heliports in certain areas, and in other areas with a special use permit, plaintiff apparently believed that the ordinance was unduly restrictive in certain respects. Through his attorney, plaintiff objected to a number of aspects of the proposal, including its prohibition of commercial aircraft operation within Webster, and the process for obtaining the Town's approval of operation of a private heliport, which plaintiff considered too cumbersome and time-consuming. *See* Minutes of Mar. 2, 2006 Town Board Meeting, Pl. App. vol. I, Ex. S, at 89. Plaintiff also voiced numerous other objections to many details of the proposed ordinance. *Id.* at 89-96.

Plaintiff alleges that Ronald Nesbitt (who had succeeded Thomas as the town supervisor) then "*sua sponte* legislated from the Webster Town [sic] by proposing a motion that prohibited the flying and landing" of all private aircraft with the exception of "ultralite / sport experimental aircraft." Amended Complaint ¶ 71. According to plaintiff, Nesbitt's proposals were significantly more restrictive than the ordinance that had been proposed by the zoning committee. Plaintiff alleges that Nesbitt's proposed "ban on all private airplane and helicopter landings and a ban on all private airports and heliports was [sic] not part of the proposed law that was before the public on March 2, 2006." Amended Complaint ¶ 73.

Following that meeting, the Board drafted a new ordinance based on Nesbitt's proposals. Plaintiff alleges that the Town Board then "convened a much smaller meeting," and passed the new ordinance on April 6, 2006. Amended Complaint ¶ 74.

The new ordinance–the stated purpose of which is to "address the operation of private airports and heliports and the operation of private aircraft in the Town of Webster and to provide

for the protection of the health, safety, and welfare of the residents of the Town," Dkt. #6 Ex. A at § 76-3–added Chapter 76 to the Town of Webster Code. That chapter, entitled "Aircraft, Airports, and Heliports, Private," provides in part that "[e]xcept as provided otherwise in this chapter, no private airplanes, private helicopters, private balloons, private hang-gliders, or private rotorcraft of any kind shall be permitted to take off or land or discharge or take on passengers within the boundaries of the Town of Webster." Dkt. #6 Ex. A at § 76-4. The ordinance also provides that "[n]o private heliport or airport will be permitted to be built within the boundaries of the Town of Webster." *Id.* at § 76-5. Plaintiff does not dispute that the operation of his helicopter and the maintenance of his landing pad fall within the scope of the prohibitions set forth in the ordinance.

The ordinance does contain several exemptions from its general prohibitions against the operation of private aircraft and airports. Specifically, the ordinance does not apply to the landing of private "ultralight aircraft,"[1] to aircraft landing or taking off from publicly owned airports, or to publicly owned and operated airports themselves. *Id.* at §§ 76-7, 76-8. No

---

[1]An "ultralight aircraft" is defined by the ordinance as an aircraft that:

A. Is used or intended to be used for manned operation in the air by a single occupant; B. Is used or intended to be used for recreation or sport purposes only; C. Does not have any US or foreign airworthiness certificate; and D. If unpowered, weighs less than 155 pounds; or E. If powered: (1) Weighs less than 254 pounds empty weight, excluding floats and safety devices which are intended for deployment in a potentially catastrophic situation; (2) Has a fuel capacity not exceeding five US gallons; (3) Is not capable of more than 55 knots' calibrated airspeed at full power in level flight; and (4) Has a power-off stall speed which does not exceed 34 knots calibrated airspeed.

Dkt. #6 Ex. A at § 76.6. It is undisputed that Plaintiff's helicopter does not qualify as an ultralight aircraft.

exemption is made for helicopters, nor was plaintiff "grandfathered in," as he had allegedly been promised by Genese.

Plaintiff commenced this action on April 9, 2008, two years after enactment of the challenged ordinance. The amended complaint, which was filed as of right on May 22, 2008, asserts four causes of action. The first two causes of action allege that defendants have violated the Equal Protection Clause of the United States Constitution, based on two theories: "selective prosecution" and "class of one." The third cause of action alleges that defendants have violated the First Amendment by passing the ordinance in retaliation for plaintiff's exercise of his First Amendment rights. The fourth cause of action seeks a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the ordinance is unconstitutional.

## DISCUSSION

### I. Motions for Summary Judgment: General Principles

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted to the movant "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (citation and internal quotation marks omitted).

In determining whether the moving party is entitled to summary judgment, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in [his] favor." *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005). *See also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("The evidence of the party opposing summary judgment is 'to be believed, and all justifiable inferences are to be drawn in [that party's] favor'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

It bears emphasis, though, that this standard does not simply require the court to draw *all* inferences in the nonmovant's favor, but all *reasonable* inferences. The issue is whether a reasonable jury could find for the nonmoving party. *See, e.g., Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009) ("Although a district court must rule on a motion for summary judgment after viewing the facts in the light most favorable to the non-moving party, it is not required to accept unreasonable inferences or sheer speculation as fact") (internal quotation marks omitted); *Carney v. City and County of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) ("Although our summary judgment standard requires us to view the facts in the light most favorable to the non-moving party, it does not require us to make unreasonable inferences in favor of the non-moving party") (internal quotation marks and alterations omitted); *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007) (on a motion for summary judgment, "we must draw all reasonable inferences in the light most favorable to the nonmovant. That does not mean, however, that we ought to draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective") (citation omitted); *Berk v. St. Vincent's Hosp. and Med. Ctr.*, 380 F.Supp.2d 334, 342 (S.D.N.Y. 2005) (although court must construe facts in light most favorable to nonmoving party, "That does not mean, however,

that a party can successfully oppose summary judgment on the basis of an unreasonable view of the facts") (quoting *Edwards v. Akzo Nobel*, 193 F.Supp.2d 680, 688 (W.D.N.Y. 2001)).

## II. Plaintiff's Claims

### A. Equal Protection Challenges to Legislative Enactments in General

Plaintiff alleges that the ordinance violates his rights under the Equal Protection Clause of the Fourteenth Amendment. Such challenges can be premised on several different theories.

"There are two types of constitutional challenges to a statute [or other legislative act]: facial challenges, in which a statute is alleged to be unconstitutional on its face, *i.e.*, in all circumstances, and 'as applied' challenges, in which a statute is alleged to be unconstitutional under the particular facts of the plaintiff's case." *MONY Life Ins. Co. v. Ericson*, 533 F.Supp.2d 921, 928 n.9 (D.Minn. 2008) (citing *Ada v. Guam Soc'y of Obstetricians & Gynecologists*, 506 U.S. 1011 (Mem.) (Scalia, J., dissenting from denial of petition for writ of certiorari)).

A legislative enactment may be struck down as unconstitutional on its face if the plaintiff demonstrates that it is "arbitrary and/or unreasonable, and not rationally related to a legitimate government interest." *Tanov v. INS*, 443 F.3d 195, 201 (2d Cir. 2006). Rational-basis review is properly applied to legislation that does not implicate any suspect classifications or impinge upon the exercise of a fundamental right. *See*, *e.g.*, *Estate of Landers v. Leavitt*, 545 F.3d 98, 112 (2d Cir. 2008); *Yuen Jin v. Mukasey*, 538 F.3d 143, 158 (2008).

An as-applied claim can also take several forms. One type of such a claim is the so-called "class of one" claim. A plaintiff proceeding on a class-of-one theory must show that he was intentionally singled out "for arbitrary treatment without a rational basis." *Clubside, Inc. v.*

*Valentin*, 468 F.3d 144, 159 (2d Cir. 2006); *see also Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (plaintiffs state an equal protection claim where they allege that they were intentionally treated differently from other similarly situated individuals without any rational basis); *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008) (stating that "the classic example of irrational government action in a class of one equal protection case in this circuit is an ordinance saying: 'No one whose last name begins with "F" may use a portable sign in front of a 24-hour food shop, but everyone else may,'" and that "[w]hat makes the ordinance in the example irrational is not simply the act of singling out, but rather that the singling out is done in such an arbitrary way") (additional internal quotation marks omitted).

Closely akin to class-of-one claims are "selective enforcement" claims. Whereas a class-of-one claim typically focuses on the sheer irrationality of the manner in which the plaintiff was treated, a selective-enforcement plaintiff must show that, compared with others similarly situated, he was selectively treated, and that "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Miner v. Clinton County*, 541 F.3d 464, 474 (2d Cir. 2008) (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005)); *accord Crowley v. Courville*, 76 F.3d 47, 52-53 (2d Cir. 1996).

In general, then, a plaintiff asserting a selective-enforcement claim must allege, and establish, that the challenged statute or ordinance subjected him to discrimination on the basis of some protected characteristic, such as his race, national origin, or sex. Such discrimination can be demonstrated in several ways:

First, a law or policy is discriminatory on its face if it expressly classifies persons on the basis of [a protected category such as] race or gender. In addition, a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion. Lastly, a facially neutral statute violates equal protection if it was motivated by animus and its application results in a discriminatory effect.

*Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999) (citations omitted). Selective-enforcement claims are based on the second of those three scenarios, *i.e.*, discriminatory application of a facially neutral law. *United States v. Deberry*, 430 F.3d 1294, 1298 (10th Cir. 2005).

In the case at bar, plaintiff alleges in the complaint that the ordinance is unconstitutional both on its face and as applied. *See* First Amended Complaint (Dkt. #3) ¶ 96. In his supplemental brief in response to the Court's Rule 12(d) Order, however, plaintiff appears to take the position that he is proceeding only on a theory of selective prosecution; he states that his theory in this case is based upon *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)–which has been described as the Supreme "Court's seminal selective prosecution decision," *Wayte v. United States*, 470 U.S. 598, 630 (1985) (Marshall, J., dissenting)–and he also recites the two-part test for selective-prosecution and selective-enforcement claims. *See* Dkt. #26-8 at 3-4 (quoting *Crowley*, 76 F.3d at 52-53).[2]

In spite of that assertion, however, there are aspects of plaintiff's arguments that appear to be closer to a facial challenge to the ordinance. He has, for example, submitted two expert reports (Dkt. #26-10, #26-11) relating to the relative safety and noise levels of helicopters and

---

[2]Although the complaint uses the term "selective prosecution," for the purposes of this case there is no practical difference between a claim of selective prosecution and a claim of selective enforcement, and the two will be used interchangeably. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1263-64 (10th Cir. 2006) (elements of selective-prosecution and selective-enforcement claims "are essentially the same"); *United States v. Barlow*, 310 F.3d 1007, 1010 (7th Cir. 2002) ("the same analysis governs both types of claims").

ultralight aircraft. That suggests that plaintiff is also alleging that the ordinance is facially

invalid, on the ground that there is no rational basis for the distinction that it draws between

ultralight and other aircraft. In addition, plaintiff has not expressly disavowed reliance on his

class-of-one claim, which is separately pleaded in the complaint.

Because it is not clear that plaintiff has limited himself to a selective-enforcement theory,

and since there is some conceptual overlap between these various theories, both generally and in

the factual context of this case, the Court will consider and address whether plaintiff has

presented a viable equal protection claim under any theory. At any rate, "[t]he formal label under

which an equal protection claim is reviewed is less important than careful identification of the

interest at stake and the extent to which society recognizes the classification as an invidious one."

*Ramos v. Town of Vernon*, 353 F.3d 171, 174 n. 1 (2d Cir. 2003) (quoting *City of Cleburne v.

Cleburne Living Ctr., Inc.*, 473 U.S. 432, 478 (1985) (Marshall, J., concurring in part and

dissenting in part)). *See also Bowman v. United States*, 512 F.Supp.2d 1056, 1065 n. 4

(N.D.Ohio 2007) (finding no practical difference, on facts before the court, between plaintiff's

as-applied and facial equal protection claims); *cf. Hensley v. United States Drug Enforcement

Agency*, No. 07-CV-398, 2007 WL 2177023, at *3 (S.D.Cal. July 25, 2007) ("without allegations

to support an as-applied challenge, the court must dismiss any counts based on this legal theory

as unsupported labels").


**B. Facial Validity**

**1. General Principles**

As an exercise of the Town's police power, *see Barnes v. Glen Theatre*, 501 U.S. 560,

569 (1991), the ordinance is entitled to a presumption of validity, and "will not be held

unconstitutional if its wisdom is at least fairly debatable and it bears a rational relationship to a permissible state objective." *Greene v. Town of Blooming Grove*, 879 F.2d 1061, 1063 (2d Cir. 1989); *see also Bibb v. Navajo Freight Lines*, 359 U.S. 520, 529 (1959) (exercise of police power is presumed to be constitutionally valid); *Genesee Scrap Tin and Baling, Co. v. City of Rochester*, 558 F.Supp.2d 432, 434 (W.D.N.Y. 2008) (same); *Ecogen, LLC v. Town of Italy*, 438 F.Supp.2d 149, 157 (W.D.N.Y. 2006) (ordinance need not be "the most efficacious, wisest or fairest possible" to survive rational-basis review); *Empire State Restaurant and Tavern Ass'n, Inc. v. New York State*, 360 F.Supp.2d 454, 460 (N.D.N.Y. 2005) ("there is a strong presumption of validity for a statute passed pursuant to state or local police power").

An ordinance regulating property use will therefore be upheld unless it is "clearly arbitrary and unreasonable, having no substantial relationship to the public health, safety, moral or general welfare." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 385 (1926); *Ecogen*, 438 F.Supp.2d at 157. Such rational-basis review is applicable to both facial and as-applied challenges. *See Cook v. Gates*, 528 F.3d 42, 62 n. 12 (1st Cir. 2008) ("The plaintiffs acknowledge that a conclusion that the Act survives rational basis review defeats their facial and as-applied equal protection challenges"); *Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006) ("This basic formulation [of the rational-basis test] applies whether the plaintiff challenges a statute on its face [or] as applied").

In applying these principles, defendants' *subjective* motivation in enacting the ordinance is irrelevant to the question of whether the ordinance itself is constitutionally valid. *See Zilich v. Longo*, 34 F.3d 359, 363 (6th Cir. 1994) (court "may not invalidate ... legislative action based on the allegedly improper motives of legislators"). As long as "the statute or ordinance does not single out particular individuals or groups for benefits or burdens and is not challenged as

discriminating on invidious grounds such as race, religion, and sex," the court "will not strike down an otherwise constitutional statute [or ordinance] on the basis of an alleged illicit legislative motive." *Fraternal Order of Police Hobart Lodge No. 121, Inc. v. City of Hobart* ("*F.O.P. Hobart*"), 864 F.2d 551, 554 (7th Cir. 1988) (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)); *see also South County Sand & Gravel Co. v. Town of South Kingstown*, 160 F.3d 834, 839 (1st Cir. 1998) (stating that courts "ordinarily do not look behind ... legislation" and that "[i]n the ordinary course, the background knowledge upon which enacted legislation is based is irrelevant"); *Sag Harbor Port Assocs. v.Village of Sag Harbor*, 21 F.Supp.2d 179, 185 (E.D.N.Y. 1998) ("whenever there exist plausible reasons for enacting a statute–whether or not those are the legislature's actual reasons for adopting the law–a court's inquiry is at an end") (citing *United R.R. Retirement Bd. v. Fritz*, 449 U.S. 166 (1980)).

One pragmatic reason for that principle is that to permit such challenges "would put at hazard a vast amount of routine legislation–federal, state, and local," all of which "would be subject to invalidation by a federal court" upon a showing that the legislators had enacted the legislation out of some personal motives. *F.O.P. Hobart*, 864 F.2d at 555. In order to avoid such a result, the Court is "entitled to presume the Ordinance to be valid and [is] not required to delve into the motivations of the Board members who proposed and drafted the Ordinance." *International Paper Co. v. Town of Jay*, 928 F.2d 480, 485 (1st Cir. 1991).

Indeed, even if legislation is enacted in direct response to a particular individual's actual or proposed activities, that alone will not render the legislation invalid, as long as it is "not pinpointed against a named individual or group[, and] is general in its wording and impact." *F.O.P. Hobart*, 864 F.2d at 556. *See also Flying J Inc. v. City of New Haven*, 549 F.3d 538, 547 (7th Cir. 2008) ("a classification is not irrational simply because it was adopted in response to a

specific" activity or situation); *Pro-Eco, Inc. v. Board of Comm'rs of Jay County*, 57 F.3d 505, 515 (7th Cir.) (stating that "legislatures may enact generally applicable legislation as a prophylactic to the danger posed by one particular actor as long as the end of the legislation is legitimate and ... the means are rationally related to the end," and finding that "[t]he Board's action here, even if unabashedly directed at a threat only Pro-Eco posed, was legitimate"), *cert. denied*, 516 U.S. 1028 (1995); *Northwestern University v. City of Evanston*, No. 00 C 7309, 2002 WL 31027981, at *6 (N.D.Ill. Sept. 11, 2002) ("the City's ... Ordinance, although motivated by concern over one particular actor, is generally applicable legislation which is rationally related to a legitimate government objective").

Consonant with these principles, the Court may consider whether the ordinance is rationally related to its *stated* purpose, but "that is ultimately not determinative, and in fact it is not necessary for defendants to enunciate *any* purpose" for the ordinance. *Ecogen*, 438 F.Supp.2d at 157 (citing *Panama City Med. Diagnostic Ltd. v. Williams*, 13 F.3d 1541, 1546 (11th Cir. 1994)) (emphasis added). Instead, "the proper inquiry is concerned with the *existence* of a conceivable rational basis, not whether that basis was actually considered by the legislative body." *Id.* (quoting *Haves v. City of Miami*, 52 F.3d 918, 922 (11th Cir. 1995)); *see also Lamers Dairy, Inc. v. United States Dep't of Agriculture*, 379 F.3d 466, 473 (7th Cir. 2004) ("Governmental action only fails rational basis scrutiny if no sound reason for the action can be hypothesized"); *WMX Technologies, Inc. v. Gasconade County, Missouri*, 105 F.3d 1195, 1201 (8th Cir. 1997) (in adjudicating a constitutional challenge to an ordinance, "we do not inquire into the methods and motives behind its passage. We ask only whether a conceivable rational relationship exists between the ordinance and legitimate governmental ends"). Such a standard is most deferential to legislative enactments.

As the party challenging the ordinance, then, plaintiff has the burden to "negative every conceivable [rational and legitimate] basis which might support" the ordinance. *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 75 (2001) (quoting *Heller v. Doe,* 509 U.S. 312, 320 (1993)). That burden is indeed a heavy one. *Mostowy v. United States*, 966 F.2d 668, 672 (Fed. Cir. 1992); *Sanitation and Recycling Industry, Inc. v. City of New York*, 928 F.Supp. 407, 412 (S.D.N.Y. 1996); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (to show that legislative act is unconstitutional, "challenger must establish that no set of circumstances exists under which the Act would be valid"); *see, e.g.*, *Flying J*, 549 F.3d at 547 (plaintiff's allegation that municipality "maliciously and spitefully" enacted an amended zoning ordinance to thwart plaintiff's proposed construction of a travel plaza did not establish that amended ordinance was unconstitutional, since "the ordinance would presumably apply to any developer trying to construct a large-scale service station," and "[t]he district court was able to hypothesize several reasons for the amended ordinance").

I also note that a facial constitutional challenge to a legislative enactment generally presents questions of law, rather than of fact. As the term implies, a facial challenge to an ordinance must be decided with reference to the face of the ordinance, not the particular facts surrounding its passage. *See St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 519-20 (8th Cir. 1999) ("because the Association's complaint asserted a facial constitutional challenge, the issues presented to the district court were questions of law and the specific facts were not relevant"); *see also Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1311-12 (4th Cir. 1995) (facial challenge to city ordinance on First Amendment grounds involved questions of law that could be resolved on motion to dismiss), *vacated and remanded on other grounds*, 517 U.S. 1206 (1996); *Mann v. Calumet City, Ill.*, No. 08 CV 555, 2009 WL 395465, at *4 (N.D.Ill. Feb. 17, 2009)

("the [relevant] factual allegations [with respect to a facial challenge to an ordinance] are the provisions of the Ordinance" itself).

Likewise, where a constitutional challenge to an ordinance that was enacted pursuant to state or local police power is premised in part upon allegations of animus, such allegations (which will typically relate more to claims concerning the enforcement rather than the enactment of the ordinance) should not even be considered by the court unless the other allegations of the complaint are sufficient to overcome the presumption of rationality that attaches to such governmental action. *See Flying J*, 549 F.3d at 547 ("It is only when courts can hypothesize no rational basis for the action that allegations of animus come into play"); *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005) ("Animus comes into play only when, no rational reason or motive being imaginable for the injurious action taken by the defendant against the plaintiff, the action would be inexplicable unless animus had motivated it").

## 2. Application to this Case

Applying these principles to the case at bar, I find that plaintiff has failed to make out a valid claim that the ordinance is unconstitutional on its face. The ordinance is, quite plainly, rationally related to the protection of the health, safety and welfare of Webster residents. Although in some respects it might arguably have been better drafted, I am unable to say that the ordinance is so arbitrary or irrational as to bear no rational relationship to any permissible governmental objective. *See County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 169 (3d Cir. 2006) (invalidating zoning legislation as irrational or arbitrary is proper "only if the governmental body could have had no legitimate reason for its decision") (quoting *Phillips v.*

*Borough of Keyport*, 107 F.3d 164, 186 (3d Cir.) (Alito, J., concurring and dissenting), *cert. denied*, 522 U.S. 932 (1997)).

As stated, the ordinance is presumed valid, and plaintiff has fallen far short of "negativ[ing] every conceivable" rational basis for it. *Tuan Anh Nguyen*, 533 U.S. at 75. The stated purpose of the ordinance is to "address the operation of private airports and heliports and the operation of private aircraft in the Town of Webster and to provide for the protection of the health, safety, and welfare of the residents of the Town." Dkt. # 6 Ex. A at § 76-3. The ordinance's prohibition on the operation of private aircraft and airports within Webster certainly bears a rational relationship to that legitimate interest. *See Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1211 (10th Cir. 2009) (plaintiffs' constitutional challenge to statutory amendments failed, since court "c[ould ]not say the Amendments ha[d] no reasonably conceivable rational basis").

"[T]he Supreme Court ... ha[s] repeatedly held [that] noise, ... safety, aesthetics, [and] valuation of adjoining land ... are rational and permissible bases for land use restrictions." *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1214 (11th Cir. 1995) (internal quotation marks omitted). *See also Vision Church v. Village of Long Grove*, 468 F.3d 975, 1001 (7th Cir. 2006) (preventing noise pollution is a legitimate municipal land planning goal), *cert. denied*, 128 S.Ct. 77 (2007); *Grace United Methodist Church v. City Of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006) ("There can be little doubt that the City's zoning ordinance is rationally related to a legitimate government purpose: the promotion of public health, safety, and general welfare of the citizens of Cheyenne"); *Koscielski v. City of Minneapolis*, 435 F.3d 898, 902 (8th Cir. 2006) ("It is undisputed [that] the purpose of the City's zoning ordinance, to protect public safety, is legitimate").

It would seem to be self-evident that prohibiting aircraft from taking off or landing within the Town of Webster, a heavily populated suburb, is rationally related to the goals of reducing noise and protecting the safety of Webster residents. *See Gustafson v. City of Lake Angelus*, 76 F.3d 778, 791 (6th Cir.) (city's prohibition on landing seaplanes on lake within city limits did not violate riparian owner's equal protection rights, since all similarly situated persons were similarly regulated, and ordinance was rationally related to legitimate land use concerns over noise, danger, apprehension of danger, destruction of property values, and interferences with other lawful uses of lake), *cert. denied*, 519 U.S. 823 (1996); *Caswell v. City of Bloomington*, 430 F.Supp.2d 907, 914 (D.Minn. 2006) (city's zoning ordinance regulating land use surrounding a newly constructed runway at municipal airport passed rational-basis test, since it was rationally related to legitimate government interest of protecting public safety); *Appeal of Green and White Copter, Inc.*, 25 Pa.Cmwlth. 445, 450 (1976) (stating that "heliports, particularly in residential areas, embody a land use, the total exclusion of which appears prima facie to be designed to protect the public interest,"and that "[t]he potential safety problems and disturbances to the tranquility of the area are obvious").

Plaintiff, however, contends that the ordinance is arbitrary and irrational because it prohibits the operation of helicopters and non-motorized aircraft, but permits "ultralight" aircraft to land in residential neighborhoods. Specifically, the ordinance provides that the prohibition against the taking off or landing of aircraft within the Town of Webster "shall not apply to the landing of ultralight aircrafts [sic] or the airports solely servicing such aircraft ... ."[3] Dkt. #6-2

---

[3]The ordinance does not expressly address the *taking off* of ultralight aircraft. That omission is not germane to the issues in this case, however.

In addition, the ordinance provides exceptions, which are likewise not at issue here, for
(continued...)

Ex. A at § 76-7(A).

In support of his argument in this regard, plaintiff has submitted two expert reports, prepared by William K. White and Phillip E. Ide. White, who is the managing director and chief inspector of AeroEd Inspection Services, LLC, opines in his report with respect to "the mechanical safety of an ultra-light as opposed to a helicopter and the specifications of ultra-light aircraft." Dkt. #26-10 at 1. Ide, a self-described "aviation consultant" with relevant experience working for the Federal Aviation Administration ("FAA") and in the United States Army, renders his opinion about "safety and noise concerns related to helicopters as compared to ultra-light aircraft." Dkt. #26-11 at 1. The main thrust of both reports is that ultralight aircraft are no safer (or quieter) than helicopters.

Defendants contend that these reports do not meet the requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure because they do not list all cases in which the alleged experts have testified during the previous four years, and do not include statements concerning the experts' compensation in this case.[4] I find it unnecessary to reach that issue, however, for the

_____

[3](...continued)
"emergency helicopters in the normal course of their duties" and for aircraft being used in connection with "approved construction projects in the Town ... ." Dkt. #6-2 Ex. A at § 76-7(A).

[4]Rule 26(a)(2)(B) provides that

Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report–prepared and signed by the witness–if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the data or other information considered by the witness in forming them;

(continued...)

reason that the opinions expressed in these two reports are largely immaterial to the issues before me, precisely because they *are* opinions.

As stated, the ordinance must be upheld "if its wisdom is at least *fairly debatable* and it bears a rational relationship to a permissible state objective." *Greene*, 879 F.2d at 1063 (emphasis added); *accord Tarantino v. City of Hornell*, 615 F.Supp.2d 102, 117-18 (W.D.N.Y. 2009). The opinions of plaintiff's experts may be well-reasoned (though I need not and do not conclude that they are), but they do not demonstrate so conclusively that ultralights are at least as, if not more dangerous than helicopters as to put the question beyond fair debate. *See Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1211 (10th Cir. 2009) (stating, with respect to amendments to state statutes concerning storage of firearms locked in vehicles on owners' property, that court "need not decide the long-running debate as to whether allowing individuals to carry firearms enhances or diminishes the overall safety of the community. The very fact that this question is so hotly debated, however, is evidence enough that a rational basis exists for the Amendments") (citing *Euclid*, 272 U.S. at 388); *Texas Mfd. Housing Ass'n, Inc. v. City of Nederland*, 101 F.3d 1095, 1106 (5th Cir. 1996) (on rational-basis review, challenged zoning decision may be overturned only upon a showing "that the legislative facts on which the classification is apparently based could not reasonably be *conceived* to be true by the governmental

---

[4](...continued)
(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

decisionmaker") (quoting *Vance v. Bradley*, 440 U.S. 93, 110-11 (1979)) (emphasis added), *cert. denied*, 521 U.S. 1112 (1997).

It bears repeating at this point that, with respect to the facial validity of the ordinance, the ultimate question is not whether the ordinance is wise, or even logical, but simply whether it bears *some* rational relationship to a legitimate end. *See Heller*, 509 U.S. at 319 ("rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices'") (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). As the Second Circuit has explained, "'[r]ational basis review ... turns on whether there are "plausible" reasons for [the legislative body]'s choices,'" not whether those choices are the best ones that could have been made. *Weinstein v. Albright*, 261 F.3d 127, 140 (2d Cir. 2001) (quoting *General Media Comm., Inc. v. Cohen*, 131 F.3d 273, 286 (2d Cir. 1997), *cert. denied*, 524 U.S. 951 (1998)). The ordinance at issue easily passes muster under that deferential standard.

No matter how persuasive the opinions of plaintiff's experts might be, they are, ultimately, just that: their *opinions*. Defendants might well have formed a different opinion. The determinative question is not whose opinion is "better," or whether plaintiff's *experts'* conclusions are sound, but whether there are some conceivable rational reasons for what *defendants* did here. *See Estill v. Cool*, No. 08-cv-606, 2008 WL 4560768, at *8 (S.D.Ohio Oct. 9, 2008) (stating that "[t]he law does not require Ohio's General Assembly to have a rational basis to impose one requirement [for public office] while rejecting another ... . What the law requires is simply rationality for what *was* imposed. The wisdom of many such [legislative] choices will always be open to debate by individuals of equal intellect, but the mere act of choosing is neither irrational nor unconstitutional") (emphasis added).

Regardless of how reasonably or well grounded White's and Ide's reasoning and analysis might be, then, they cannot show that the *Town*'s choices, as embodied by the ordinance, are wholly irrational. The purported expert reports are therefore, as stated, largely irrelevant to the issues before me. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 84 (2000) (stating, with respect to age-based classifications, that the fact "that age proves to be an inaccurate proxy in any individual case in irrelevant," because, "where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect'") (quoting *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 316 (1976)).

Furthermore, any assessment of the relative safety of helicopters and ultralights depends to a great extent on how one defines "safety" in that context. There are many variables and parameters that could enter into such an equation: the frequency of crashes associated with each type of aircraft, the severity of a typical accident involving a given aircraft, and so on. White's and Ide's own reports demonstrate this, since they base their opinions (as indeed they must) on particular criteria that *they* deem relevant and important, such as the degree to which helicopters and ultralights are regulated by the FAA, and what they believe to be the typical practices of ultralight pilots (*e.g.*, Ide opines that "[m]any ultralight owners experiment with possible unproven designs such as adding an extra passenger seat").

All that these reports prove, then, is that it is impossible to reduce the *desirability* of allowing helicopters, ultralights, or other aircraft to operate within a particular area to a precise mathematical formula. Such decisions necessarily depend on imprecise, subjective judgments and perceptions that defy quantification, and which are, in the end, incapable of being "proven" or "disproven." It is precisely for that reason that such decisions are ill-suited to judicial review and are instead committed to the legislative sphere. *See New York City Transit Auth. v. Beazer*,

440 U.S. 568, 592 (1978) (the "exclusionary line challenged by respondents ... represents a policy choice ... made by that branch of Government vested with the power to make such choices"); *Powers v. Harris*, 379 F.3d 1208, 1216-17 (10th Cir. 2004) (stating that "rational-basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question," and that court may not "overturn a statute on the basis that no empirical evidence supports the assumptions underlying the legislative choice"), *cert. denied*, 544 U.S. 920 (2005).

As this Court has previously stated,

[c]ourts will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, because the problem could have been better addressed in some other way, or because the statute's classifications lack razor-sharp precision. This is the standard of review because the judicial system has long recognized that the problems of government are practical ones and may justify, if they do not require, rough accommodations–illogical, it may be, and unscientific.

*Ecogen*, 438 F.Supp.2d at149 (W.D.N.Y. 2006) (internal quotes and alterations omitted). *See also Greater Chicago Combine and Center, Inc. v. City of Chicago*, 431 F.3d 1065, 1072 (7th Cir. 2005) (stating, with respect to challenge to municipal ordinance prohibiting keeping of pigeons in most residential areas, "It is true that other animals make noise, leave droppings, and can be otherwise unsavory. Nonetheless, without delving into the distinctions between pigeons and dogs, for instance, we can put this issue to rest by simply acknowledging that a city's decision to address a problem gradually is rational"); *Forseth v. Village of Sussex*, 199 F.3d 363, 370-71 (7th Cir. 2000) ("Absent a fundamental right or a suspect class, to demonstrate a viable equal protection claim in the land-use context, the plaintiff must demonstrate 'governmental action wholly impossible to relate to legitimate governmental objectives'") (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995)).

Plaintiff also raises a few other arguments bearing upon the facial validity of the

ordinance, but these require only brief mention. First, plaintiff states in his memorandum of law that the ordinance "carves out [an exception allowing] the use of a private ultralite [aircraft] ... to land in the backyard of Robert Bechtold," who also lives in Webster. Dkt. #14 at 24. While that may be plaintiff's interpretation of the ultralight exception, the ordinance itself says nothing about Bechtold or any other particular property or aircraft owner; it simply creates a general exception for ultralight aircraft. Furthermore, even assuming that the underlying purpose of the ultralight exception was to benefit Bechtold, however, that is irrelevant to whether the ordinance is *facially* valid.[5] *Zilich*, 34 F.3d at 363; *F.O.P. Hobart*, 864 F.2d at 554.

That the ordinance might have the practical effect of benefiting Bechtold or some other individual is not dispositive. The law is clear that a "classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality." *Heller v. Doe*, 509 U.S. 312, 319 (1993) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911)); *see also Rojas-Reyes v. I.N.S.*, 235 F.3d 115, 123 (2d Cir. 2000) (legislative acts "need not result in the most just or logical result in every case to pass constitutional muster").[6]

_____

[5]Plaintiff alleges that "the only reason" for the ultralight exclusion was that Bechtold has entered into agreements with the Town in which he agrees not to develop certain property that he owns, in exchange for tax abatements on that property, in furtherance of the Town's "open space" policies. Plaintiff's Rule 56.1 Counter Statement (Dkt. #26) ¶ 136. Although plaintiff has submitted a copy of those agreements, *see* Pl. App. vol. I, Ex. U, he has presented no evidence to support his "connect the dots" reasoning implying a nexus between those agreements and the ordinance. In any event, even if these property agreements are the "real reason" for the ultralight exemption, that would not render the ordinance constitutionally infirm, as explained above.

[6]Paradoxically, plaintiff alleges that the Town deliberately carved out the ultralight exception so that Bechtold could continue to operate his ultralight craft, yet he also alleges that, as drafted, the exception does not actually cover Bechtold's plane. Plaintiff alleges that Bechtold's aircraft exceeds the weight and passenger limitations of the ordinance's definition of

(continued...)

Plaintiff's contention that the ordinance is irrational because it permits ultralight aircraft to operate, but not other relatively lightweight or quiet aircraft such as hang gliders or balloons, is a red herring. Plaintiff is not seeking to be allowed to fly a balloon or a hang glider, but a helicopter. The salient distinction, then, for purposes of this case, is that between ultralight aircraft and helicopters, and it is rather obvious that there are significant differences between the two and the manner in which each operates.[7]

What all of plaintiff's arguments boil down to is a contention that the ordinance is invalid because, in enacting the ordinance, the Town drew a line, allowing some aircraft to operate within Webster, and others not to. Plaintiff may be unhappy with the side of the line on which he finds himself, but there is no basis in the law for requiring a legislative body to take an all-or-nothing approach to dealing with a perceived problem. *See Williamson v. Lee Optical*, 348 U.S. 483 (1955) ("The legislature may select one phase of one field and apply a remedy there, neglecting the others"); *Railway Express Agency v. New York*, 336 U.S. 106 (1949) ("It is not a requirement of equal protection that all evils of the same genus be eradicated or none at all"); *see*, *e.g.*, *USA Baseball v. City of New York*, 509 F.Supp.2d 285m 295 (S.D.N.Y. 2007) (in suit

_____

[6](...continued)
ultralight aircraft. Dkt. #26-8 at 25. Regardless, Bechtold and his purported ultralight are not similarly situated to plaintiff and his helicopter.

[7]The Court can postulate some distinctions between ultralights and other lightweight or relatively quiet aircraft. The drafters of the ordinance may have believed, for instance, that balloons and hang gliders, being to some extent at the mercy of the wind, are therefore not as capable of landing in a precise location as are ultralight, motorized aircraft. They may also have believed that hot air balloons are simply too large to be compatible with a residential area.

Again, though, whether such considerations actually did play a role in defendants' thinking, or whether such beliefs are completely correct, is not the issue. What matters is whether there is a *conceivable* rational relationship between the ordinance and some legitimate governmental objective. *See Powers*, 379 F.3d at 1217 ("this Court is *obligated* to seek out ... conceivable reasons for validating a ... statute," regardless of whether legislature actually considered those reasons).

challenging city's ban on use of certain types of bats in high school baseball games, plaintiffs' argument that there was no logical basis for distinguishing between non-wood composite bats and wood composites or wood laminates failed, since city could "act incrementally or draw the line imperfectly so long as there was ... a conceivable rational connection between the classification drawn and a legitimate purpose").

## C. Selective-Enforcement and Class-of-One Claims

As stated, the first and second causes of action in the amended complaint assert equal protection claims based respectively on theories of selective enforcement and "class of one." The gist of both claims is that plaintiff has been treated differently from other similarly situated persons, for no legitimate reason.

"While the Second Circuit has not resolved the question of whether there is truly a distinction between selective enforcement and class of one equal protection theories, courts in this circuit have repeatedly treated them as distinct theories with distinct elements of proof and have accordingly evaluated them as separate claims." *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3978208, at *14 n. 18 (E.D.N.Y. Aug. 21, 2008) (quoting *Bonenfant v. Kewer*, No. 05cv01508, 2007 U.S. Dist. LEXIS 64104, at *24 (D.Conn. Aug. 30, 2007)). *See also African Trade & Info. Ctr. v. Abromaitis*, 294 F.3d 355, 363-64 (2d Cir. 2002) (plaintiffs' allegation that government official refused to contract with them because they had publicly criticized his conduct in office did not allege that the actions were irrational, as required for a class-of-one equal protection claim, but that they were *impermissible* under the First Amendment); *Vassallo v. Lando*, 591 F.Supp.2d 172, 184 n. 9 (E.D.N.Y. 2008) (employing "the slightly different formulations set forth by the Second Circuit for each claim"); *Lavoie-Francisco v. Town of*

*Coventry*, 581 F.Supp.2d 304, 312 (D.Conn. 2008) (selective-enforcement and class-of-one claims are "two related, yet different, equal protection arguments") (quoting *Cobb v. Pozzi*, 363 F.3d 89, 109 (2d Cir. 2004)).  Therefore, I will evaluate Casciani's class-of-one and selective-enforcement claims separately, although I reach the same result as to both.  *See Balakrishnan v. Kusel*, No. 08-cv-1440, 2009 WL 1291755, *6 (E.D.N.Y. May 8, 2009) (stating that "it is not entirely clear whether the selective enforcement cause of action as articulated [by the Second Circuit] still exists in light of the Supreme Court's 'class of one' jurisprudence," but adding that "in an abundance of caution, the Court has analyzed plaintiff's selective enforcement claim as a separate cause of action" from his class-of-one claim).

### 1. Selective-Enforcement Claim

To state a selective-enforcement claim, plaintiff must allege that, compared with others similarly situated, he was selectively treated, and that "such selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person."  *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995); *accord Jones v. J.C. Penny's Dept. Stores, Inc.*, No. 03-CV-920, 2007 WL 1577758, *9 (W.D.N.Y. May 31, 2007).  "A plaintiff generally must satisfy both elements to establish a claim of selective enforcement."  *Washpon v. Parr*, 561 F.Supp.2d 394, '409 (S.D.N.Y. 2008) (quoting *LaTrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999)).

In the case at bar, plaintiff asserts that he was subject to selective enforcement of (1) the ordinance, (2) Gen. Bus. L. § 249, and (3) various town code provisions.  The evidence in the record supports none of these claims, however.

There are two fundamental flaws with all three of these claims. First, most of the individuals with whom plaintiff seeks to compare himself were not similarly situated to him during the relevant time periods. Second, plaintiff cannot show that the ordinance, § 249, or the Town code provisions were actually *enforced* against him at all, much less that they were *selectively* enforced.

"[D]emonstrating that a plaintiff has been treated differently from similarly situated individuals is the *sine qua non* of a ... selective enforcement violation." *Kamholtz v. Yates County*, No. 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008) (internal quotation marks omitted). The Second Circuit has held that at the initial pleading stage, a "general allegation" to that effect is sufficient. *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003). *But see Assoko v. City of New York*, No. 06-cv-11414, 2009 WL 1108745, at *4 (S.D.N.Y. Apr. 24, 2009) (noting that "the Second Circuit has not yet revisited" the "liberal *DeMuria* standard" in light of the Supreme Court's stiffening of the federal pleading requirements in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

Pursuant to this Court's Rule 12(d) Order, however, we have moved beyond the pleading stage, and are now at the summary judgment stage. The standards with respect to the similarly-situated element are much more stringent on a summary judgment motion than on a Rule 12(b)(6) motion for failure to state a claim. It is not enough at this point for plaintiff simply to allege that he and others were similarly situated; "at the summary judgment stage, a plaintiff must present *evidence* comparing [himself] to individuals that are 'similarly situated *in all material respects*.'" *Vassallo*, 591 F.Supp.2d at 184 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)) (emphases added and additional internal quotation marks omitted); *see*, *e.g.*, *Tarantino*, 615 F.Supp.2d at 113 (granting summary judgment for defendants on

plaintiff's claim of selective enforcement where plaintiff "failed to show that he and the other landlords that he has identified were similarly situated in all material respects").

Although determining whether parties are similarly situated is typically "a fact-intensive inquiry," *Clubside*, 468 F.3d at 159, a "court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation ... where no reasonable jury could find that the persons to whom the plaintiff compares [him]self are similarly situated." *Id.*; *accord Maulding Development, LLC v. City of Springfield*, 453 F.3d 967, 970 (7th Cir. 2006); *see also Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) (although "the ultimate determination as to whether parties are similarly situated is a fact-bound inquiry[,] that does not mean that every case ... is a jury case"); *Neilson*, 409 F.3d at 106 (holding that no rational person could have found that alleged comparators were similarly situated, notwithstanding jury's finding to the contrary).

In the case at bar, plaintiff has identified several individuals who he claims were similarly situated to him, but before examining their particular circumstances, it is necessary to establish *which* circumstances are material to that determination. As stated, plaintiff must show that he has been treated differently from others who are similarly situated to him in all material respects. Determining what is "material" in that regard, however, can only be determined with reference to the particular "treatment" at issue. For example, if a property owner alleges that a particular zoning ordinance has been enforced against him but not against other property owners, whether the other property owners put their properties to the same use as the plaintiff may be material if the ordinance at issue relates to permissible property uses, but not if it relates to minimum lot size.

With respect to the ordinance itself, it seems self-evident that to be similarly situated to plaintiff, an individual would at the very least have to be subject to the ordinance; in other words,

someone who owns or operates an aircraft within the Town of Webster that is covered by the ordinance. *See Hill v. City of Scranton*, 411 F.3d 118, 127 (3d Cir. 2005) (all city employees who were subject to city ordinance's residency requirement were similarly situated for purposes of First Amendment and equal protection analysis). If a particular individual is not covered by the ordinance, then the Town's "failure" to enforce the ordinance against that person would be probative of nothing; there would be nothing to enforce against that person.

Plaintiff has identified only two individuals who, he alleges, own and have operated aircraft in Webster since the passage of the ordinance: Bechtold and John Roessel. Bechtold allegedly owns three aircraft. *See* Pl. App. vol. II, Ex A ¶ 18. As stated, however, Bechtold flies ultralight aircraft, which are expressly permitted by the ordinance.[8]

Plaintiff alleges that in fact, one of Bechtold's aircraft is a two-seater ultralight, and hence does not fit within the ordinance's definition of an ultralight as an aircraft that, *inter alia*, "[i]s

---

[8]Another individual, Richard Swingly, has allegedly operated some unspecified aircraft, at some point in the past, within the Town of Webster. Plaintiff does not appear to dispute defendants' contention that Swingly has not operated a plane within Webster for at least 20 years, however. Dkt. #22 ¶ 40.

Plaintiff also alleges that one Brian Hegedorn has flown "sesnas" without interference from the Town. Dkt. #26-8 at 7. Again, plaintiff does not appear to dispute that Hegedorn has not flown any aircraft within Webster in over two decades. *Id.*

While it is immaterial to my decision, since there is no indication that Hegedorn ever operated a helicopter or was otherwise similarly situated to plaintiff, it is not clear what "sesnas" refers to. Jack Roessel states in his affidavit that he owns a "Senna 180 Seaplane," so perhaps "sesnas" is a misspelling of "Sennas."

It appears, however, that "Senna" may itself be a misspelling of "Cessna." A "Google" search using the search terms "180 seaplane" turns up several sites referring to a "Cessna 180" model seaplane, but no "Sennas." Meanwhile, a search for "Senna seaplane" yields no relevant results, and a search for "sesna" produces a Ukrainian internet search engine by that name and a handful of other sites having nothing to do with aircraft. There is nothing in the record before me to indicate that "sesnas" refers to any type of helicopter.

used or intended to be used for manned operation in the air by a single occupant," and "[w]eighs less than 254 pounds empty weight ... ." In support of that assertion, plaintiff has submitted the report of one of his experts, William White, who asserts that "[t]he minimum empty weight of a 2 manned ultra-light is 325 pounds." Dkt. #26-10 at 3. Plaintiff has also submitted the affidavit of James Kubrich, who states that he lives next door to Bechtold and that "[o]nce in a while" Kubrich has seen Bechtold flying with a passenger in his ultralight. Pl. App. vol. II, Ex. H ¶ 5. He also states that "[t]he last time [he] observed Mr. Bechtold operating his aircraft was last fall (2008)," although he does not state whether Bechtold had a passenger on that occasion, nor does he state any dates on which he has seen Bechtold flying with a passenger.

Even assuming that the ordinance prohibits Bechtold's two-seater from flying within Webster, however, the fact that it is not a helicopter, but an ultralight (albeit not an ultralight within the definition in the ordinance) is a material difference between Bechtold and Casciani. It is clear that the Town perceived helicopters to be more of a concern than ultralights, and there is no evidence that, if plaintiff had flown an ultralight–even a two-seater weighing more than 254 pounds–the Town *would* have enforced the ordinance against him. *See Brandt v. Davis*, 191 F.3d 887, 893 (8th Cir. 1999) (plaintiff's allegation that city failed to enforce zoning laws against her neighbor did not show purposeful discrimination against plaintiff for purposes of equal protection claim).

A useful analogy to this case is found in *Gottlieb v. Village of Irvington*, 69 F.Supp.2d 553, 559 (S.D.N.Y. 1999). There, the plaintiff property owners asserted a claim of selective enforcement based on the defendant village's issuance of a stop-work order relating to the plaintiff's construction of a driveway in a location that did not conform to their subdivision plat.

Granting the village's motion for summary judgment, the district court held that the

plaintiffs had not shown that they were selectively treated compared with someone similarly situated, based on their allegation that their neighbors' driveway, which had been installed years earlier, was also non-conforming, yet the village had never taken any enforcement action against the neighbors. The court stated that there was no evidence that the village had known of the neighbors' non-conforming driveway location before the driveway was constructed and yet allowed construction to proceed. *Id.* at 559.

"Moreover," the court pointed out,

> even if plaintiffs could prove the Village *did* know at the time the [neighbors] were constructing their driveway that it was nonconforming, that alone would not make out an equal protection violation. Failure to proceed against others who are comparably situated is not by itself a basis for finding a denial of equal protection.

*Id.* (citing *Zahra*, 48 F.3d at 684).

The court added that since the plaintiffs did not allege that they had been discriminated against because of their race or religion, or to prevent them from exercising a constitutional right, plaintiffs were required to show "malicious or bad faith intent by the Village to injure the Plaintiffs." *Id.* Finding such evidence lacking, the court stated that all that the plaintiffs had offered were their subjective feelings that the village "was trying to get them to abandon the building of their dream home," but that they "had no evidence on which to base such feelings. Their suspicions were thus mere speculation." *Id.*

In addition to those defects in plaintiff's selective-enforcement claim, it suffers from yet another flaw. Even assuming that Bechtold could be considered similarly situated to plaintiff, and assuming that he has, on occasion, flown his two-seater in violation of the ordinance, and further assuming that Town officials knew of that fact and yet did nothing to enforce the ordinance against Bechtold, there is no evidence that the ordinance was selectively enforced *against plaintiff*, for the simple reason that there is no evidence that the ordinance has been

33

enforced against him at all. In their Statement of Undisputed Facts (Dkt. #22), defendants assert that "[t]o date, the Town has taken no enforcement actions with respect to the plaintiff's helicopter ... or helipad ... ." *Id.* ¶ 21. Plaintiff does not appear to dispute that assertion. While it may well be that plaintiff has not attempted to fly his helicopter since the ordinance was passed, the fact remains that he has not presented evidence that he has been selectively *treated* compared to other similarly situated persons. The ordinance's enactment and presence "on the books" does not demonstrate selective enforcement, actual or threatened.[9]

By its very nature, a claim of selective enforcement requires actual, or at least threatened, enforcement, or *some* sort of selective "treatment" of the plaintiff, compared to others in similar situations. *See, e.g.*, *Orgain v. City of Salisbury*, 305 Fed.Appx. 90, 98 (4th Cir. 2008) (owners of nightclub with predominantly black clientele, who alleged selective enforcement of city nuisance laws, were required at summary judgment stage to proffer evidence that police chief threatened plaintiff with prosecution for violation of the nuisance laws, but did not threaten similarly situated nightclub with predominantly white clientele, because of that difference in the racial composition of their clientele).

Indeed, the Second Circuit has stated that "a showing that the plaintiff was treated

---

[9]If plaintiff had presented evidence that he and Bechtold were both flying their aircraft in Webster at, or close to, the same time on the same day, and that only plaintiff was charged with a violation, he might be able to satisfy this element of a selective-enforcement claim. *See, e.g.*, *Griffin v. City of Heath*, No. 2:04-CV-119, 2006 WL 745294, at *14 (S.D.Ohio Mar. 21, 2006) (finding that African-American plaintiff who presented uncontroverted evidence that he was asked to move his vehicle off the street during a snow emergency while his Caucasian neighbor was not, had presented sufficient evidence to raise a material issue of fact with regard to the discriminatory effect of defendant officers' actions, but going on to find that plaintiff had not presented sufficient evidence to raise a genuine issue of material issue of fact with regard to the discriminatory *purpose* of the officers' actions under the rational-basis test). Since plaintiff has not alleged that the ordinance has ever been enforced against him, however, he cannot make such a showing.

differently compared to others similarly situated" is a "prerequisite" and a "threshold matter" to a selective enforcement claim. *Church of the American Knights of the KKK v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004). *See, e.g., LaTrieste Rest.*, 40 F.3d at 590 (plaintiff business raised issues of triable fact with respect to its selective-enforcement claim, based on evidence that defendant town had never enforced certain zoning ordinance against plaintiff when plaintiff operated as an Italian restaurant and cabaret, but that Town began to enforce ordinance shortly after plaintiff changed to a sports bar/topless cabaret format). *See also Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000) (plaintiff alleging selective enforcement must demonstrate, *inter alia*, that defendant (1) singled plaintiff out for prosecution and (2) decided not to prosecute other persons in similar situations); *Jennejahn v. Village of Avon*, 575 F.Supp.2d 473, 482-83 (W.D.N.Y. 2008) (selective treatment compared to others similarly situated "is essential to a selective enforcement claim").

Often this is discussed in the case law in terms of Article III standing to sue, also known as the "case or controversy" requirement. *See, e.g., Bronson v. Swensen*, 500 F.3d 1099, 1109 (10th Cir. 2007) (stating that "[p]laintiffs' § 1983 claims for prospective relief based upon Utah's criminal prohibition of polygamy lie closer to the 'no credible threat' [of prosecution] end of the injury-in-fact continuum," since "[p]laintiffs were never charged, prosecuted, or directly threatened with prosecution under" the statute); *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996) (plaintiffs lacked standing to challenge federal firearms statute, since they " ha[d] not articulated concrete plans to violate" the statute, and "[t]he acts necessary to make plaintiffs' injury–prosecution under the challenged statute–materialize [we]re almost entirely within plaintiffs' own control"); *Davidson v. Culver City*, No. CV04-2220, 2004 WL 5361378, at *14 ("Neither fear nor the mere possibility of discriminatory enforcement

creates a concrete cognizable injury in fact required to satisfy Article III's case and controversy requirement for standing") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555-610 (1992)), *aff'd*, 159 Fed.Appx. 756 (9th Cir. 2005); *Lash v. City of Union*, No. C-3-98-045, 1999 WL 33127974, at *6 (S.D.Ohio Sept. 27, 1999) ("courts have concluded that the plaintiffs did not have standing to assert a selective enforcement claim, when the defendants had not enforced the ordinance in question against them") (citing cases).[10]

Here, there is no evidence–indeed, there is no allegation in the complaint–that plaintiff has ever been sanctioned under the ordinance, or that defendants have otherwise "enforced" the ordinance against him. In the absence of such evidence, a claim of selective enforcement cannot stand. *See Phelps v. Hamilton*, 934 F.Supp. 373, 376 (D.Kan. 1996) ("To infer that plaintiff faces a clear or present danger of unlawful prosecution would require sheer speculation that plaintiff will violate the ... statute in the future and that third persons will likewise do so, but that defendant for unconstitutional reasons will selectively prosecute only plaintiff").

That defect in plaintiff's proof also defeats his claim with respect to the other individual who is alleged to have flown an aircraft within Webster since the ordinance took effect. Plaintiff alleges that Webster resident John Roessell has since 1990 owned a seaplane that he continues to operate, without interference from the Town. Plaintiff has submitted an affidavit from Roessel stating that he "ha[s] been able to take off and land [his] plane with the full knowledge of Webster town officials with no problem, and [that he], along with numerous other aircrafts [sic] owners, continue to do so." Pl. App. vol. II, Ex. F ¶ 18. He also alleges that following the meeting of the Town Board passed the ordinance, Roessel "asked Town of Webster Building

---

[10]I note that although defendants do not appear to have raised standing as a separate ground for their motion, "standing ... is jurisdictional and not subject to waiver." *Lewis v. Casey*, 518 U.S. 343, 349 n. 1 (1996).

Inspector Thomas Pellett how the [sic] affected [Roessel]," and that Pellett responded, "you're ok ... go ahead and land and take off as usual ... no one's gonna give you any problem ... that law's just for Casciani."

Roessel does not state how he knows that his continued operation of his seaplane has occurred with the Town's "full knowledge," nor does he identify the "numerous" other individuals who are currently operating aircraft within Webster, what sort of aircraft they fly, or where they take off and land. As with Bechtold, however, the real problem with this claim is that plaintiff has not shown that the ordinance has been enforced against *him*.

As to Pellett's alleged statement about the ordinance being "just for Casciani," that statement appears to be inadmissible hearsay. Although Pellett was a Town employee, there is no indication in the record that he was authorized to speak about the scope or applicability of the ordinance, *see* F.R.E. 801(d)(2)(C), nor does his statement appear to have related to a matter within the scope of his employment, *see* F.R.E. 801(d)(2)(D).

The ordinance itself does not expressly confer upon any particular official or body primary authority for enforcing its provisions. Section 76-12(A), entitled "Enforcement; penalties for offenses," provides certain penalties for "[a]ny violation of this chapter or of any order, requirement decision or determination issued by the Commissioner of Public Works or his/her agent or designee ... ." Subsection (B) also provides that "[i]n addition to the penalties provided above, the Town Board may also institute any appropriate action or proceeding to prevent, correct or restrain any violation of this chapter." Those provisions, then, indicate that the Town Board, and perhaps the Commissioner of Public Works, have some powers relative to

enforcement of the ordinance, but they make no mention of the Building Inspector.[11]

The Town Building Inspector's authority is addressed in Chapter 86.  Section 86-10, entitled "Powers and duties of Building Inspector," sets forth various powers and responsibilities of the building inspector relating to "the erection, alteration, removal and demolition of buildings or structures or parts thereof ...," but makes no mention of aircraft, airports, or Chapter 76.  There is, then, no apparent basis upon which Pellett's alleged statement would be admissible in this action.

Aside from that, plaintiff has not presented evidence from which one could reasonably conclude that he and Roessel are similarly situated.  Although operation of a seaplane within the Town's geographical limits appears to fall with the proscriptions of the ordinance, the simple fact is that a seaplane is significantly different in several respects from a helicopter.  Presumably, Roessel's seaplane takes off from and lands on the water, some distance from the shore.  While taxiing on the water, the plane would be more akin to a boat than to an aircraft in flight.  Plaintiff's helicopter, in contrast, takes off from and lands on a concrete helipad that plaintiff constructed on his property.  Without passing judgment on which aircraft would be considered more objectionable by the average person, it is indisputable that they look, sound, and behave *differently*, and even if there were evidence–which there is not–that the Town had enforced the ordinance against plaintiff but not against Roessel, those differences render them not similarly situated for purposes of a selective-enforcement claim.

---

[11]The provisions dealing generally with the Department of Public Works are contained in Chapter 56 of the Code.  The Court takes judicial notice of the Webster Town Code, which is available online via the Town's website, at http://www.ecode360.com/?custId=WE0220.  *See Nelson v. City of Rochester*, 492 F.Supp.2d 282, 284 n.1 (W.D.N.Y. 2007) (taking judicial notice of Rochester Municipal Code); *see also* F.R.E. 201(b)(2) (court may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

Additionally, there remains the fundamental flaw in plaintiff's proof: the absence of evidence that the ordinance has been enforced against him. Even assuming that plaintiff can get over the obstacle of his seeming lack of Article III standing, he cannot establish a claim of selective enforcement without showing that he has been treated differently from at least one other similarly situated person. *Cobb*, 363 F.3d at 110. By comparing himself to Roessel, and attempting to show differential treatment because Roessel has flown his aircraft since the ordinance was passed and has not been penalized for it, plaintiff has placed himself in the position of having to show, at the very least, that *he* has flown, or attempted to fly, his helicopter, and that he *has* been penalized, or prosecuted, or prevented from flying, by the Town. He has not made such a showing.

Plaintiff's selective-enforcement claim based on § 249 fares no better. Plaintiff alleges that "Webster resident Thad Swift routinely had helicopters land at his" restaurant, Hedges 9 Mile Point ("Hedges") in Webster. Dkt. #3 ¶ 42. In support of that assertion, plaintiff has submitted an affidavit from Swift stating that he is a part owner of Hedges, that "[h]istorically, a variety of aircraft, including helicopters, have regularly landed at the restaurant with incident or provocation from the Town of Webster," and that Hedges "never had to comport with New York General Business Law § 249." Dkt. #14-2 at 50 ¶¶ 3, 5.[12]

---

[12]Swift's affidavit was filed by plaintiff in opposition to defendants' Rule 12(b)(6) motion to dismiss (and, since it was outside the pleadings, is one of the reasons why the Court decided to convert the motion to a motion for summary judgment). Plaintiff does not appear to mention Swift or Hedges in his submissions in response to the Court's Rule 12(d) Order, however.

Plaintiff does not appear to allege that helicopters have continued to operate to and from Hedges since the ordinance was passed, nor does he appear to dispute defendants' contention that no such activity has occurred at Hedges in over 20 years. Even assuming the truth of plaintiff's allegations, then, all such activity at Hedges appears to be purely "historical," and to have occurred long before the events giving rise to this lawsuit.

Plaintiff alleges, however, that at defendants' request, he withdrew his § 249 application, and there is no evidence that he has ever been penalized in any way for not obtaining a permit under § 249.[13]  The undisputed facts, then, show that plaintiff has not been treated differently from Swift.  Although plaintiff has submitted evidence that Swift and Hedges were never required to comply with § 249, the fact is that plaintiff was not required to do so, either.  There is no evidence that plaintiff was ever in any way penalized or made to suffer any adverse consequences based on his failure to obtain a § 249 permit.

To the extent that the complaint can be read as attempting to base a selective-enforcement claim on the alleged discriminatory enforcement of the Town's building code provisions concerning other matters unrelated to flying the helicopter, such a claim fails as well.  For one thing, plaintiff does not allege that any enforcement action was ever actually taken against him

---

[13]Plaintiff alleges that the "real reason" why the Town asked him to withdraw his § 249 application was expressed by then-Town Supervisor Cathryn Thomas at an April 2005 Board meeting at which she expressed concern that "[i]f an application [under § 249] is submitted prior to the Town establishing an ordinance [governing private airports] the Town would not have the opportunity to hold the applicant to the ordinance."  Pl. App. vol. I, Ex. J at 2.

It would hardly have been unreasonable, however, for the Town to want to hold off on granting any permits for the construction of private airports until after the Town had a chance to draft and enact a comprehensive ordinance dealing with that matter.  At worst, this might show that Genese misled plaintiff into thinking that plaintiff would be "grandfathered in" to whatever ordinance was passed, but plaintiff has not articulated any theory under which that would provide a basis for a constitutional claim.

Furthermore, "estoppel will not lie against municipalities." *Coggins v. County of Nassau*, 615 F.Supp.2d 11, 29 n.7 (E.D.N.Y. 2009) (quoting *United States v. Schmitt*, 999 F.Supp. 317, 360 (E.D.N.Y. 1998)); *see also Coney Island Resorts, Inc. v. Giuliani*, 103 F.Supp.2d 645, 657 (E.D.N.Y. 2000) ("equitable estoppel against the government is foreclosed 'in all but the rarest of cases'" and "must be supported by proof that the government's conduct was willful, wanton, or reckless") (quoting *New York State Medical Transporters Ass'n v. Perales*, 77 N.Y.2d 126, 130 (1990)).  There is no evidence here that Genese deliberately misled plaintiff about being grandfathered in, particularly since the ordinance was significantly changed from, and made more narrow than, the original draft proposal following the March 2, 2006.

based on his failure to obtain a permit. Plaintiff alleges only that code enforcement officer Winter "threaten[ed] court action for items located at or on [plaintiff's] properties ...," and that Winter sent him a "written notice ... indicating that [plaintiff's use of a helicopter landing pad] was not an 'enumerated use' of the Webster Town Code." Casciani Aff. (Dkt. #26-9) ¶¶ 49, 50. Thus, there never was any actual "enforcement" of those provisions against plaintiff.

In addition, there is no basis for imposing liability on the Town or Nesbitt for Winter's actions. Plaintiff has neither alleged nor presented facts suggesting that Winter's "admoni[tions]" to him about storing unregistered vehicles on his property and the like were issued pursuant to an official policy or custom of the Town. *See Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978). In short, there is no evidence that Winter acted pursuant to any Town policy, and his actions–which apparently never went beyond "admonitions"–would not give rise to a § 1983 claim in any event. *See Aguilera v. County of Nassau*, 425 F.Supp.2d 320, 324 (E.D.N.Y. 2006) (dismissing complaint where there were no "no facts from which it can be inferred, even circumstantially, that a County custom or policy ... was the driving force of the plaintiff's alleged constitutional violation"); *Curto v. Bender*, No. 04-CV-26, 2005 WL 724156, at *11 (W.D.N.Y. 2005) (dismissing § 1983 claim against county based on failure to allege facts showing that acts complained of were taken pursuant to county policy), *aff'd*, 231 Fed.Appx. 93 (2d Cir. 2007); *see also Rasche v. Village of Beecher*, 336 F.3d 588, 600 (7th Cir. 2003) (village code enforcement officer was "certainly not the person with final policymaking authority" for the village, as she "occupied a position quite analogous to a police officer making an arrest").

I also note that there is no evidence that defendants acted out of any "impermissible considerations such as race, religion, [or] intent to inhibit or punish the exercise of constitutional

rights ... ." *Bizzarro*, 394 F.3d at 86. Plaintiff, who is of Italian descent, has alleged that

defendants singled him out "based on the Plaintiff's national origin and ancestry," Amended

Complaint ¶ 1, but as discussed in more detail below in the context of plaintiff's "national

origin" claim, the evidence fails to support that allegation.

Aside from that, plaintiff's allegations might, at most, suggest that defendants acted out

of a "malicious or bad faith intent to injure" plaintiff. *Bizzarro*, 394 F.3d at 86. The facts in the

record, however, show only that the dispute over plaintiff's helicopter was the eventual *cause* of

some hard feelings between him and Town officials, not the other way around.

As the Second Circuit observed in *Bizzarro*, "cases predicating constitutional violations

on selective treatment motivated by ill-will, rather than by protected-class status or an intent to

inhibit the exercise of constitutional rights, are 'lodged in a murky corner of equal protection law

in which there are surprisingly few cases and no clearly delineated rules to apply.'" *Id.* (quoting

*LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980), *cert. denied*, 450 U.S. 959 (1981)). The

court in *Bizzarro* also noted that although it had "frequently referred to the *LeClair* formulation

..., often in the zoning context," the court had "rarely ... found a constitutional violation" under

that standard. *Id. See also LeClair*, 627 F.2d at 610-11 (finding no constitutional violation in

case involving dairy farmer who alleged that defendant milk inspector had maliciously denied

him a license to ship milk out of state, where, after scouring the record for evidence of malicious

or bad faith intent to injure the plaintiff, court found none beyond the fact that the farm inspector

"was in a spiteful mood").

To the extent that the evidence shows any malice toward plaintiff on the part of Nesbitt or

other Town officials, that same evidence shows that whatever ill will existed between plaintiff

and defendants sprang from plaintiff's operation of his helicopter and his resistance to the

Town's efforts to rein in that operation. In other words, even when the evidence is viewed in the light most favorable to plaintiff, all that it shows is that the dispute over plaintiff's helicopter may have escalated to the point where some antagonism eventually developed between plaintiff and Town officials, but the dispute was not caused by any preexisting animus toward plaintiff. Indeed, plaintiff alleges that in October 2005, Nesbitt (who was then a Board member and had not yet been elected supervisor) visited plaintiff's property, and, after seeing where plaintiff proposed building a helipad, said to plaintiff, "Who could have a problem with this? I don't have a problem with this." Plaintiff's Aff. ¶ 115. That hardly bespeaks some preexisting animus toward plaintiff on Nesbitt's part. *See Jercich v. County of Merced*, No. 1:06-CV-00232, 2006 WL 3747184, at *10 (E.D.Cal. Dec. 19, 2006) (dismissing selective-enforcement claim and noting that "the facts do not show a history of conflict between Jercich and the County Defendants," which tended to show that defendants did not act out of malice toward plaintiff).

Plaintiff's selective-enforcement claim against Nesbitt also fails for lack of evidence of Nesbitt's personal involvement in any enforcement actions. To make out a valid § 1983 claim against an individual defendant, a plaintiff must allege the defendant's personal involvement in the constitutional violation. *Liner v. Goord*, 582 F.Supp.2d 431, 433 (W.D.N.Y. 2008) (citing *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001), and *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)). There is no evidence that Nesbitt was involved in Winter's alleged acts concerning code violations by plaintiff. *See Miller v. Bailey*, No. 05-CV-5493, 2008 WL 1787692, at *8 (E.D.N.Y. Apr. 17, 2008).

Even if plaintiff could show some selective treatment, then, this claim would fail for lack of evidence of some improper motivation. In *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12 (2d Cir. 1999), for example, the Second Circuit held that the plaintiff business had failed

to demonstrate the existence of an issue of material fact with respect to its claim that the defendant town had selectively enforced an ordinance regarding commercial signage, based on one instance of the town's apparent failure to enforce the ordinance against another property owner. The court stated that regardless of whether that one instance alone created a material issue of fact as to selective treatment of those similarly situated, the plaintiff "ha[d] failed to show a material issue of fact as to the key issue in an equal protection claim alleging selective enforcement–impermissible motive." *Id.* at 17. As to that issue, the court stated, the plaintiff's "assertion that the Town enforced the ordinance against it with an impermissible motivation [wa]s sheer 'conjecture and speculation' that [wa]s insufficient to withstand the Town's motion for summary judgment") (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)). *See also Jennejahn v. Village of Avon*, 575 F.Supp.2d 473, 483 (W.D.N.Y. 2008) (stating that plaintiff's "contention that he was singled out for unfavorable treatment because [of third party's political influence wa]s purely speculative and not grounded in any facts reasonably supporting his theory," and that plaintiff's "self-serving and conclusory allegations of political influence [we]re insufficient to establish a claim for selective prosecution, or the existence of a material issue of fact concerning the same"); *Jercich*, 2006 WL 3747184, at *10 (dismissing selective-prosecution claim where plaintiff's "complaint does not allege an irrational motive or animus[ for defendants' alleged enforcement of code against him but not against his neighbors], other than conclusory conspiracy claims"); *Hi Pockets, Inc. v. Music Conservatory of Westchester, Inc.*, 192 F.Supp.2d 143, 158 (S.D.N.Y. 2002) (granting defendants' motion for summary judgment as to plaintiff's equal protection claim alleging that defendants had selectively granted building permits on the basis of political motives, where plaintiff failed to demonstrate that discrimination was based on impermissible factor or that defendants intended to cause injury to

plaintiff).

## 2. Class-of-One Claim

In *Olech*, the Supreme Court reaffirmed the existence of "successful equal protection claims brought by a 'class of one' ... ." 528 U.S. at 564. "Unlike [a] selective prosecution claim, [an] *Olech*-based equal protection claim is not dependent on [the plaintiff's] ability to prove that [he was treated differently] for an *impermissible* reason," such as his race or political affiliation. *Cobb*, 363 F.3d at 110 (emphasis added). "Rather, under *Olech*, the plaintiff[] can recover if [he] can show that [he was] treated differently from similarly situated [persons], ... and that there was 'no rational basis for the difference in treatment.'" *Id.* (quoting *Olech*, 528 U.S. at 564). *See also United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008) ("a class-of-one equal protection challenge asserts that an individual has been irrationally singled out, without regard for any group affiliation, for discriminatory treatment") (internal quotation marks omitted); *Prestopnik v. Whelan*, 249 Fed.Appx. 210, 213 (2d Cir. 2007) (noting that "*Olech* might be read to eliminate any requirement of malice or bad faith in 'class of one' cases").

A class-of-one plaintiff must therefore demonstrate the existence of persons in circumstances similar to his own, who received more favorable treatment than the plaintiff, for no rational reason. *See Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 139-40 (2d Cir. 2008); *Balakrishnan*, 2009 WL 1291755, at *5. In addition, the Supreme Court in *Engquist v. Oregon Dep't of Agriculture*, ___ U.S. ___, 128 S.Ct. 2146 (2008), added an additional element, holding that a class-of-one plaintiff must show that the difference in treatment resulted from non-discretionary state action. *See id.* at 2154; *Balakrishnan*, 2009 WL 1291755, at *5. The Court in *Engquist* reasoned that

"[t]here are some forms of state action ... which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments," and that "[i]n such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Id.*

"Although the Court in *Engquist* noted that '[t]his principle applies most clearly in the employment context,' *id.*, numerous courts have applied Engquist to bar 'class of one' claims in connection with discretionary decisions made outside the government-employee context." *Seymour's Boatyard, Inc. v. Town of Huntington*, No. 08-CV-3248, 2009 WL 1514610, at *7 (S.D.N.Y. June 1, 2009); *accord Crippen v. Town of Hempstead*, No. 07-CV-3478, 2009 WL 803117, at *6 (E.D.N.Y. Mar. 25, 2009). *See*, *e.g.*, *Flowers v. City of Minneapolis*, 558 F.3d 794, 799 (8th Cir. 2009) (applying *Engquist* to a "police officer's decisions regarding whom to investigate and how to investigate"); *Moore*, 543 F.3d at 901 ("a class-of-one equal protection challenge, at least where premised solely on arbitrariness/irrationality, is just as much a 'poor fit' in the prosecutorial discretion context as in the public employment context"); *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008) (applying reasoning of *Engquist* to government-contractor relationship); *Tarantino*, 615 F.Supp.2d at 117 (applying *Engquist* to case involving city ordinance regulating rental properties). *See also Marino Shoreham-Wading River Central School Dist.*, No. CV-08-0825, 2008 WL 5068639, at *7 (E.D.N.Y. Nov. 20, 2008) ("The *Engquist* holding has been applied by courts to any discretionary determination by decisionmakers, even outside the public employment context"). To withstand defendants' motion for summary judgment on this clam, therefore, Casciani must show that there are genuine issues of fact as to each of those elements. *Ferguson v. City of Rochester School Dist.*, 485 F.Supp.2d 256, 260 (W.D.N.Y. 2007).

With respect to the existence of similarly situated persons, the standard of proof is even higher on a class-of-one claim than it is on a selective-enforcement claim. The Second Circuit has held that "a class-of-one plaintiff must show, among other things, an 'extremely high degree of similarity between [himself] and the persons to whom [he] compares [himself]' in order to succeed on an equal protection claim." *Doninger v. Niehoff*, 527 F.3d 41, 53 (2d Cir. 2008) (quoting *Clubside*, 468 F.3d at 159). Indeed, the plaintiff and his comparators must be "*prima facie* identical in all relevant respects." *Neilson*, 409 F.3d at 104 (citation and quotation marks omitted). *See, e.g.*, *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) (comparator residential developments were not *prima facie* similar because, for example, one did not have the same layout and another did not seek the same variances from the planning board) (cited in *Clubside*, 468 F.3d at 160); *Tarantino*, 615 F.Supp.2d at 113-14 (plaintiff landlord was not similarly situated to other landlords with respect to City of Hornell's residency requirement, since "the other landlords all resided, if not in Hornell proper, at least in the immediate area," whereas plaintiff lived "a considerable distance from Hornell").

The court has also made clear that "[t]his showing is more stringent than that used at the summary judgment stage in the employment discrimination context." *Clubside*, 468 F.3d at 159. The reason, the court stated, is that "'the existence of persons in similar circumstances who received more favorable treatment than the plaintiff' in a class-of-one case 'is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose–whether personal or otherwise–is all but certain." *Id.* (quoting *Neilson*, 409 F.3d at 105). As another district court from this circuit has explained, "in the absence of differing treatment based upon a plaintiff's protected class or the exercise of his or her fundamental constitutional rights, more weight is

shifted to the first prong of a class of one equal protection claim to counterbalance the lesser showing needed to satisfy the second prong." *Osborne v. Fernandez*, No. 06-CV-4127, 2009 WL 884697, at *40 (S.D.N.Y. Mar. 31, 2009) (adding that "[l]ike all questions of fact, should a plaintiff fail to establish a genuine issue of material fact on this element of his or her claim, a court may grant a defendant's motion for summary judgment dismissing this claim") (citing *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790-91 (2d Cir. 2007)).

To defeat defendants' summary judgment motion, then, plaintiff "has an affirmative duty to present evidence establishing a prima facie case that would allow a reasonable jury to find that his position was identical in all material aspects to the position of those to which he compares himself." *Kasprzycki v. DiCarlo*, 584 F.Supp.2d 470, 477 (D.Conn. 2008) (citing *Neilson*, 409 F.3d at 105). *See also Maulding Development*, 453 F.3d at 971 (stating that "[t]o survive summary judgment[ on his class-of-one claim], it is Maulding's burden to produce evidence showing a dispute of material fact," and finding that plaintiff failed to do so as to the similarly-situated requirement). *See also Vassallo*, 591 F.Supp.2d at 190 ("[T]he Second Circuit has left no doubt that a [class of one] plaintiff must meet a high threshold to move beyond summary judgment") (quoting *Pina v. Lantz*, 495 F.Supp.2d 290, 304 (D.Conn. 2007)).

The Court has already discussed plaintiff's alleged comparators in connection with his selective-enforcement claim, and will not repeat that discussion here. Suffice it to say that since plaintiff's showing was insufficient to withstand defendants' motion for summary judgment as to his selective-enforcement claim, his class-of-one claim falters on this ground as well.

In addition, plaintiff has also failed to show any non-discretionary acts by defendants, and his purported class-of-one claim is therefore barred under the reasoning of *Engquist*. Prior to the enactment of the ordinance, there was no law that specifically addressed the operation of aircraft

within Webster, other than a state statute of general application–§ 249–which prohibited the operation of an "airport" within a town anywhere in the state without approval from the town's governing body. There were no written criteria, then, for determining whether the operation of any particular aircraft within Webster constituted a problem that needed to be addressed, and any actions taken by the Town in that regard were entirely discretionary.[14]

Even after the ordinance was passed, any action taken by the Town to enforce the ordinance was necessarily discretionary.[15] In *Engquist*, the Court used the following illustration of actions that "by their nature involve discretionary decisionmaking":

> Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized.

128 S.Ct. at 2154. *See also Tarantino*, 615 F.Supp.2d at 117 & n. 11 (applying *Engquist* to enforcement of town code provisions because of the degree of discretion involved); *Nasca v. Town of Brookhaven*, No. 05-CV-122, 2008 WL 4426906, at *11 n.4 (E.D.N.Y. Sept. 25, 2008)

---

[14]In addition, to the extent that plaintiff alleges "harassment" or similar acts by the Town prior to the passage of the ordinance, most of those acts fall outside the three-year statute of limitations applicable to § 1983 claims. *See Harris v. City of New York*, 186 F.3d 243 (2d Cir. 1999). The complaint in this case was filed on April 29, 2008. *See also Dennis v. Local 804*, No. 07 CIV. 9754, 2009 WL 1473484, at *3 n.3 (S.D.N.Y. May 27, 2009) ("Courts may dismiss a claim as time-barred *sua sponte* where ... it is clear that the applicable statute of limitations has run") (citing *Leonhard v. United States*, 633 F.2d 599, 609 n. 11 (2d Cir. 1980), *cert. denied*, 461 U.S. 908 (1981)). That alleged "harassment," which consisted of nothing more than various notices, warnings, and unfulfilled threats of unspecified "court action," *see* Plaintiff's Rule 56.1 Counter Statement ¶¶ 54, 55, does not give rise to a § 1983 claim in any event, however.

[15]As stated, there is no evidence that defendants *have* taken any action to enforce the ordinance against plaintiff. I mention this only to point out that to the extent that plaintiff, despite that lack of evidence, attempts to allege that he has been irrationally singled out for enforcement of the ordinance, such a claim would be barred by *Engquist*.

("to the extent plaintiff is challenging the discretionary decisions by the Town as to the enforcement of its permit laws and code provisions, *Engquist* suggests that 'class of one' challenges cannot be asserted as to such decisions"); *Sloup*, 2008 WL 3978208, at *17 (*Engquist* rule "would preclude a class of one claim" based on allegation that town's enforcement of town code provision requiring removal of any "menace to navigation" within town waters, "because such a determination is clearly discretionary"); *Occhionero v. City of Fresno*, No. 05-1184, 2008 WL 2690431, at *9 (E.D.Cal. July 3, 2008) (stating that court would "heed[] the warning of ... the U.S. Supreme Court's observation in *Engquist* as to undermining discretion," and would not allow plaintiff to proceed on a "class-of-one equal protection claim ... to permit second guessing of the City's code enforcement measures at issue here").

Finally, to the extent that the complaint can be read as asserting a class-of-one claim based on the passage—as opposed to the enforcement—of the ordinance, such a claim is tantamount to a facial challenge to the ordinance, and fails for the reasons already stated with respect to that challenge. Even if, as a practical matter, plaintiff is the only person who is currently affected by the ordinance, or even if the ordinance was enacted in direct response to plaintiff's operation of his helicopter, that does not give rise to a constitutional claim, as long as the ordinance is facially neutral and is not being applied in a discriminatory manner. *Flying J*, 549 F.3d at 547; *Pro-Eco*, 57 F.3d at 515; *F.O.P. Hobart*, 864 F.2d at 556. *See also Bass River Associates v. Mayor, Twp. Comm'r, Planning Bd. of Bass River Twp.*, 743 F.2d 159, 161, 166 (3d Cir. 1984) (affirming dismissal of equal protection challenge to ordinance where appellants were the only persons adversely affected by ordinance when it was enacted); *Sag Harbor Port Assocs.*, 21 F.Supp.2d at 185 (although plaintiff, who sought to build tennis club on its property, was the only property owner affected by ordinance prohibiting issuance of special use permits for

building of tennis clubs, plaintiff could not establish how the ordinance "targeted" the plaintiff, since on its face the ordinance applied to every property owner in the plaintiff's district).[16]

## D. First Amendment Retaliation Claim

Casciani alleges that defendants violated his First Amendment rights by retaliating against him for having spoken out about the ordinance as it was originally drafted. Specifically, plaintiff contends that after he complained about the proposed ordinance, the Town withdrew it and passed the current, more stringent ordinance, which bans almost all private aircraft, including plaintiff's helicopter, from operating within Webster.

"[T]he Second Circuit has 'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context.'" *Sloup*, 2008 WL 3988208, at *22 (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)). Where a private citizen asserts a First Amendment claim against a public official, the plaintiff must demonstrate that: (1) the plaintiff engaged in speech or conduct protected by the First Amendment; (2) defendants' actions were motivated by the exercise of plaintiff's First Amendment rights; and (3) defendants' actions effectively chilled plaintiff's exercise of those rights. *See Williams*, 535 F.3d at 76 (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *Sloup*, 2008 WL 3988208, at *22; *Moran v. City of New Rochelle*, 346 F.Supp.2d 507, 517 (S.D.N.Y. 2004).

According to the complaint, defendants "retaliated" against him for having opposed the proposed ordinance by withdrawing that proposal and instead enacting a more draconian ordinance that simply banned virtually all private aircraft from operating within Webster.

---

[16]Although the ordinance itself draws a distinction between ultralight and non-ultralight aircraft, that distinction cannot support Casciani's class of one claim because, as explained earlier, there is a rational basis for the ordinance and such distinctions.

*See* Dkt. #3 ¶¶ 70-74.  Plaintiff also alleges that defendants thereby reneged on their alleged "promise to 'grandfather in' Plaintiff's use and landing of his helicopter in the Town of Webster ... ."  Amended Complaint ¶ 91.

There is no dispute here that, by publicly opposing the proposed ordinance, plaintiff engaged in protected activity.  *See Velez v. Levey*, 401 F.3d 75, 97 (2d Cir. 2005) ("speech critical of the exercise of the State's power lies at the very center of the First Amendment"); *Bennett v. Hendrix*, 423 F.3d 1247, 1255-56 (11ᵗʰ Cir. 2005) (police officers could not lawfully retaliate against private citizens for having sponsored a voter referendum that was opposed by the officers), *cert. denied*, 549 U.S. 809 (2006); *Jenkins v. Schwarzenegger*, No. CIV S-04-2520, 2006 WL 2620446, at *2 (E.D.Cal. Sept. 12, 2006) (noting that an individual "has a First Amendment right to voice his opinion about proposed legislation"); *Mack v. Alabama Dep't of Human Resources*, 201 F.Supp.2d 1196, 1209 (M.D.Ala. 2002) (plaintiff's letter to state department of human resources director voicing her opposition to certain proposed legislation constituted speech about a matter of public concern for purposes of First Amendment analysis).

What is missing here, however, is an allegation or evidence of unlawful retaliation.  That Nesbitt or the Board members, by passing the revised, more restrictive ordinance, may have acted, in part, in response or reaction to plaintiff's various objections to the earlier proposed ordinance does not mean that their passage of the ordinance–which is facially neutral and valid–amounts to unconstitutional retaliation.  To hold otherwise would eviscerate the rule against "looking behind" facially valid legislation, and would allow plaintiff to circumvent that rule by dressing his claim in First Amendment clothing.

In *F.O.P. Hobart*, for example, Seventh Circuit held that the plaintiff police officers had failed to state a First Amendment claim against certain city council members based on the

officers' allegation that, out of retaliation for the officers' support of the council members' victorious opponents in a city council election, the lame-duck council members had passed an ordinance (which the police officers had opposed) requiring all city workers, including the police, to work an average of forty hours per week.  In so ruling, the court stated that on its face, the ordinance "*appear[ed]* to be an utterly commonplace personnel regulation," and that even if the council members had been motivated by a desire to punish the officers for having opposed their reelection, that would not violate the Constitution, since the First Amendment "does not outlaw the interest-group state," nor does it "purge politics from politics."  864 F.2d at 554 (Posner, J.).  Likewise, that Nesbitt and the Board members in this case may have enacted an ordinance that was stricter than the original draft, even if they did so partly because of the many objections that plaintiff had raised to that draft proposal, that does not support a finding that they retaliated against plaintiff for having exercised his First Amendment rights.  All it shows is that they responded to plaintiff's laundry list of objections by passing an ordinance that was more sweeping in its scope, but also simpler and less subject to what they may have seen as nitpicking criticisms.

In addition, in cases "involving criticism of public officials by private citizens," the Second Circuit has "impose[d] an actual chill requirement for First Amendment retaliation claims," *i.e.*, a requirement that the plaintiff allege and ultimately prove an "actual chill" of his First Amendment rights.  *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citing *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir.), *cert. denied*, 506 U.S. 819 (1992)); *see also Curley*, 268 F.3d at 73 ("plaintiff must show, with respect to the third element, that his First Amendment rights were actually chilled") (internal quotation marks omitted).

To establish that element, it is not enough for plaintiff simply to show that he changed his

behavior in some way, such as by no longer flying his helicopter; he must show that defendants intended to, and did, prevent or deter him from exercising his rights under the First Amendment. *See*, *e.g.*, *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996) (to establish First Amendment retaliation claim, plaintiffs must show that defendants acted "with the purpose of deterring the exercise of First Amendment freedoms"); *Wolff v. Town of Mount Pleasant*, No. 06 CIV. 3864, 2009 WL 1468691, at *6 (S.D.N.Y. Apr.27, 2009) ("In order to maintain a First Amendment retaliation claim, a private citizen complainant must allege that the defendant took some action in response to his or her First Amendment activity that 'effectively chilled the exercise of his First Amendment right'") (quoting *Williams*, 535 F.3d at 76); *see also Nike, Inc. v. Kasky*, 539 U.S. 654, 683 (2003) ("chilling effect" means that the plaintiff or other potential speakers, "out of reasonable caution or even an excess of caution, may censor their own expression well beyond what the law may constitutionally demand") (Breyer, J., dissenting from dismissal of writ of certiorari). Plaintiff has not made such a showing.[17]

Here, even when all reasonable inferences are drawn in plaintiff's favor, it is clear that the

---

[17]To the extent that this claim is asserted against Nesbitt in his individual capacity, it is also barred by the doctrine of absolute legislative immunity, which "attaches to all actions taken in the sphere of legitimate legislative activity." *Bogan v. Scott Harris*, 523 U.S. 44, 54 (1997). Pursuant to this doctrine, "[l]ocal legislators, such as members of a town board, are absolutely immune from civil rights lawsuits provided that the actions for which they are being sued are 'legislative.'" *Livant v. Clifton*, 334 F.Supp.2d 321, 326 (E.D.N.Y. 2004) (town board's actions in holding a hearing, voting, and approving a resolution which authorized the removal of a nuisance were "clearly legislative in nature," and town board members were absolutely immune from liability for such actions) (citing *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 (2d Cir. 2003)), *aff'd*, 272 Fed.Appx. 113 (2d Cir. 2008); *see also Jemal's Fairfield Farms, LLC v. Prince George's County*, 319 F.Supp.2d 618, 632 (D.Md. 2004) (stating that "[i]t is well established that members of local governmental bodies are entitled to absolute legislative immunity from claims against them arising out of their actions in a legislative capacity," and that "[t]he actions of proposing, discussing, and voting on proposed legislation fall within the ambit of legislative actions") (internal quotation marks and citations omitted).

only thing that the ordinance "chilled" was plaintiff's use of his helicopter. Nothing in the

evidence suggests that plaintiff's right to complain or speak out has been chilled by the

enactment of the ordinance or by anything else that defendants did. *See Spear*, 954 F.2d at 67

("Spear's naked assertion of a chill does not suffice to defeat a Rule 12(b)(6) motion"); *see also*

*Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (affirming summary judgment for

defendant on First Amendment claim, but indicating that plaintiff had failed even to state a valid

claim because she had "alleged no actual affect on the exercise of her First Amendment rights at

all"), *cert. denied*, 538 U.S. 961 (2003); *Griffin-Nolan v. Providence Wash. Ins. Co.*, No.

504CV1453, 2005 WL 1460424, at *8 (N.D.N.Y. June 20, 2005) (dismissing First Amendment

claim on ground that "Plaintiff ha[d] not alleged that Defendants' actions effectively chilled him

from filing a complaint"). Accordingly, plaintiff's First Amendment retaliation claim must be

dismissed.[18]

---

[18]I recognize that there is authority that "where the retaliation is alleged to have caused an injury separate from any chilling effect, such as a job loss or demotion, an allegation as to a chilling effect is not necessary to state a claim." *Puckett v. City of Glen Cove*, 631 F.Supp.2d 226, 239 (E.D.N.Y. 2009) (citing *Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005)). No such independent injury has been shown here, however. The mere fact that, by virtue of the Town's exercise of its police power, plaintiff is no longer able to fly his helicopter to and from his private property, may not have been to his liking, but it is not, in my view, an "injury" cognizable under § 1983. *See Gill*, 389 F.3d at 383 (standing to sue "is no issue whenever the plaintiff has clearly alleged a *concrete harm* independent of First Amendment chilling") (emphasis added); *see also Smith v. Maypes-Rhynders*, No. 07 Civ. 11241, 2009 WL 874439, at *4 (S.D.N.Y. Mar. 31, 2009) (inmate may state First Amendment claim by alleging either that his exercise of his First Amendment rights has been chilled, or a "*serious injury* that is independent of a possible First Amendment chill") (citing *Gill*, 389 F.3d at 380-84) (emphasis added); *Free Speech v. Reno*, No. 98 CIV. 2680, 1999 WL 147743, at *3-*4 (S.D.N.Y. Mar. 18, 1999) (absent showing of actual chill of First Amendment rights, plaintiff must show an "injury in fact," *i.e.*, deprivation of a legally protected interest).

**E. National Origin, § 1981, § 1985 and § 1986 Claims**

In addition to his selective-enforcement and class-of-one claims, plaintiff purports to assert an equal protection claim alleging unlawful discrimination based on his Italian ancestry. The "Preliminary Statement" of the amended complaint states, *inter alia*, that plaintiff alleges that his equal protection rights have been denied "based on the Plaintiff's national origin and ancestry pursuant to 42 U.S.C. § 1981, and for retaliation under that statute as well." Dkt. #3 ¶ 1. The jurisdictional statement also states that this action is brought not only under § 1983, but also under § 1985(3) and § 1986. Neither § 1981, § 1985, nor § 1986 appears to be mentioned elsewhere in the complaint, however.

As to the reference to national-origin discrimination, the complaint alleges only that: (1) "the Town of Webster has an established pattern of discriminating against Italian Americans, particularly in the use of their property in the Town of Webster, and its official's [sic] have referred to Italian Americans and 'dagos,' 'wops' and 'criminals,'" Dkt. #3 ¶ 17; (2) Town attorney Genese told plaintiff that "there [we]re those who believe[d]" that plaintiff's operation of his helicopter was unlawful, including then-supervisor Cathryn Thomas, plaintiff's neighbor Joe Oster (whom plaintiff describes as Thomas's "former lover, ... who made his dislike of Italians well known to the Plaintiff," Dkt. #3 ¶ 36); and (3) "Town of Webster residents of non-Italian descent were able to operate and land aircraft in the Town of Webster, without prohibition," Dkt. #3 ¶ 40. None of the individual causes of action explicitly asserts a claim of national-origin discrimination, nor do they cite §§ 1981, 1985 or 1986.

Given these scant references to national origin or ancestry in the complaint, it might seem unclear whether plaintiff actually intends to pursue such a claim. It appears that he does, however, because in his supplemental filings in response to the Court's Rule 12(d) Order,

plaintiff has submitted several affidavits from other Webster residents that purport to support plaintiff's contention that he has been discriminated against based on his Italian ancestry. Those affidavits fail utterly in their intended purpose, however.

The first affidavit is that of Anthony Casciani, who has been the Town of Webster Planning Board Chairman for over three decades, and who is apparently plaintiff's father.[19] Anthony Casciani states in that affidavit that "[f]rom [his] experiences in the Town of Webster, it is clear that certain Town officials and community members have a disdain and dislike for the Plaintiff because he is an Italian American." Plaintiff's Appendix of Exhibits ("Pl. App.") vol. II, Ex. A ¶ 4.

The remainder of Anthony Casciani's affidavit, however, provides zero facts to support that assertion. He simply repeats and rephrases, several times, his basic, conclusory allegation that defendants are prejudiced against Italian Americans, and that their actions toward plaintiff have been motivated by discriminatory animus, but he presents not a shred of evidence to back up that very serious allegation.

In another affidavit, Michael Collichio, a self-described "Italian American and a Town of Webster business owner," states that he too has "experienced the selective enforcement of the Webster Town Codes by the Town of Webster and its officials because [he is] Italian American, because [he is] closely associated with other Italian Americans, and because [he has] opposed the Town's treatment of [himself] on that basis." Pl. App. vol. II, Ex. D ¶ 5. Collichio goes on to relate that he has been the victim of harassment at the hands of Town officials stemming from

---

[19]One of the exhibits submitted by plaintiff is a copy of an essay written by defendant Nesbitt and published in the *Webster Post* newspaper on June 4, 2008, in which Nesbitt states that plaintiff's "father, Tony Casciani, has been a member [of the Town Board] for many years ... ." *See* Plaintiff's Appendix of Exhibits vol. I, Ex. X. Plaintiff does not appear to deny that assertion.

Collichio's attempts to develop certain property that he owned in 1999. *Id.* ¶ 6. Collichio filed his own federal civil rights suit against the Town in 2001, which was settled in 2004. Collichio states in his affidavit submitted in this action that he is "100% confidential [sic] that if [he] did not bring that case to federal court the Town would have continued to harass [him] because [he is] Italian." *Id.* ¶ 53.

In a third affidavit, Thomas D'Amico, who states that he "was the former Assistant Building Inspector from 4/1988 [and] then became the acting Building Inspector for the Town of Webster until 8/1993" (in other words, years before any of the relevant events here occurred), claims to have "witnessed [during his tenure in those positions] that certain Italian American residents of the Town of Webster were treated differently and were 'picked on' by Town officials due to their open dislike of Italian Americans." Pl. App. vol. II, Ex. B ¶ 3. D'Amico goes on to state that he "heard from various sources that the Town just hates Italians, and sentiments such a 'this town, Italians, Italians, and what do we do? Nothing.'" *Id.* ¶ 4.

Although the remainder of D'Amico's allegations are no more probative of discrimination against plaintiff than the two statements quoted above, they are worth quoting further, if only to show how insubstantial they are. D'Amico states that he "knew of one official who served on the Town Board [who] could not stand Italians." *Id.* ¶ 5. That person, whom D'Amico identifies by name, does not appear to have been a Board member at the time of the events giving rise to this lawsuit or to have had anything to do with this case. D'Amico also states that the Board's "dislike for certain individuals would show up in zoning decisions," in the sense that the Board would make such decisions "based on whether they liked you or not," and "on the basis of who they liked and did not ... ." *Id.* ¶¶ 6-7. D'Amico does not state, or provide any evidence, though, that "who they liked and did not" had any correlation with national origin,

58

ethnicity, or any other protected characteristic.

Once again equating the physical weight of his submissions with evidentiary weight, plaintiff has also submitted excerpts from deposition testimony that D'Amico gave in Collichio's civil rights action. During his testimony, D'Amico stated, *inter alia*, "I can't prove it, but I have a feeling that they're [*i.e.* the Town] picking on" Collichio. Pl. App. vol. I Ex B at 71. This colloquy followed:

Q. It is possible that they're picking on him because he's Italian?

\* \* \*

A. Is it possible? It could be possible.

I mean, I've heard things that–at the coffee shop about the Town disliking Italians.

Q. Like what?

\* \* \*

A. Just that the Town–they just hate Italians.

I know one on the Board–as a matter of fact, a friend of mine, ... his ex-wife, her uncle was on the Board, ... [her uncle] can't stand Italians, and that was ... from him through her that he just hates 'em.

\* \* \*

That's what I heard, you know, and just through sitting around through the years you hear things, and–you know, "This Town, Italians, Italians, and what do we do? Nothing."

Pl. App. vol. I Ex. B at 71-72. According to plaintiff, this testimony–consisting of D'Amico's "feelings," which by his own admission he could not prove, triple hearsay involving persons who have no connection with Casciani's case,[20] and grumblings that D'Amico had "heard ... at the

[20]The "uncle" of the ex-wife of a friend of D'Amico, whom D'Amico identified by name, does not appear to have been on the Board at the time that the ordinance at issue in the case at bar
(continued...)

coffee shop"– "confirms" the Town's animus against Italian-Americans. Casciani Aff. (Dkt. #26-9) ¶ 9.[21]

These affidavits do not add one iota of admissible evidence in support of plaintiff's claim of national-origin discrimination. They simply amount to a piling up of hearsay, the affiants' subjective beliefs, and naked allegations, unsupported by any facts, of a generalized animus on the part of the Town against Italian Americans. Conclusory allegations do not cease to be conclusory simply by being repeated by multiple people, however. *JWK Int'l Corp. v. United States*, 52 Fed.Cl. 650, 663 (Fed.Cl. 2002) ("conclusory allegations ... become no less conclusory by repetition").[22]

Plaintiff also repeatedly alleges that his neighbor Oster, who, in letters to Town officials and in person at Board meetings, opposed plaintiff's operation of a helicopter and construction of a landing pad, was biased against Italian Americans. Even assuming those allegations to be true, however, there is no basis for imputing Oster's alleged animus to the Town. Plaintiff alleges that Oster was a "close friend" of then-Board member Thomas, but there is no evidence suggesting that the Board was aware of Oster's alleged animus, that they gave undue weight to Oster's complaints, or that they did not exercise their own independent judgment or reach their own

---

[20](...continued)
was passed.

[21]In support of his allegation that the Town discriminates against Italian Americans, plaintiff also cites a fourth affidavit, that of Angelo Arcoleo. *See* Plaintiff's Mem. of Law (Dkt. #26-8) at 4. Arcoleo's affidavit, however, says nothing at all about such discrimination. *See* Pl. App. vol. II, Ex. C.

[22]In that vein, I note that plaintiff's submission filed in response to the Court's Rule 12(d) Order comprise no less than 623 pages (defendants', meanwhile, total 27 pages). As this Court stated of another attorney in a different case, "[p]laintiff's counsel has apparently proceeded on the basis that the volume of her submissions will be equated with substance." *Murphy v. Board of Educ. of Rochester City School Dist.*, 273 F.Supp.2d 292, 302 n.8 (W.D.N.Y. 2003), *aff'd*, 106 Fed.Appx. 746 (2004).

unbiased conclusions about plaintiff's helicopter use and whether to enact the ordinance.  *See*

*Contreras v. City of Chicago*, 119 F.3d 1286, 1292 (7th Cir. 1997) ("If a government official, for

instance, did not know of ... private citizens' animus, it would be hard to impute that animus as a

cause of the government action"); *Hodges v. Public Bldg. Comm'n of Chicago*, 864 F.Supp.

1493, 1504 n.3 (N.D.Ill. 1994) ("The 'bigoted comments of a few citizens' are not sufficient to

demonstrate discriminatory intent" on the part of a local government) (quoting *Metropolitan*

*Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1292 (7th Cir. 1977), *cert.*

*denied*, 434 U.S. 1025 (1978)); *see also United States v. Hastings*, 126 F.3d 310, 314 (4th Cir.

1997) (declining to impute animus of referring investigative agency to government official who

made decision to prosecute).

Although this is not directly related to plaintiff's allegations of unlawful discrimination, I

also note that in his most recent "memorandum of law" (which hardly fits that description, as it

recites a little black-letter law on pages three and four, then devotes the remainder of its twenty-

six pages to a rehash of plaintiff's litany of factual allegations), plaintiff at one point alleges that

"[t]he Town of Webster, in particular Cathryn Thomas, solicited Oster to compile falsified

evidence to demonstrate that Plaintiff's helicopter was somehow creating a 'noise nuisance' in

the level of noise it was producing."  Dkt. #26-8 at 13.

Plaintiff's most damning allegations seem typically to be those that are most lacking in

evidentiary support, and this one is no exception.  Plaintiff has presented no evidence that the

Town or Thomas "solicited Oster to compile falsified evidence."  All that he offers in support of

that assertion is (1) his subjective disagreements with some of the assertions that Oster made

before the Board, and (2) a report authored by Carl Salvaggio, Ph.D., concerning a video

recording of plaintiff's helicopter in flight, that Oster apparently made and submitted to the

Board.  Dr. Salvaggio, an associate professor at the Rochester Institute of Technology who holds a doctorate in environmental resource engineering, was hired by plaintiff to render an opinion about the audio portion of the recording.  He opines that the sound on the recording is "severely over-modulated," meaning, in short, that it is not an accurate recording of the sound actually produced by the helicopter.  Dkt. #26-12 at 4.

Dr. Salvaggio does *not* state, however, that he believes that the sound was deliberately "altered" by the person who made the recording, as plaintiff alleges, *see* Dkt. #26-8 at 13, and in fact he states that depending on the type of video camera that was used, a "calibration step," which could have reduced or eliminated any audio distortion, "*might not have been an option* for the person making the recording."  Dkt. #26-12 at 4.

Furthermore, even if there were evidence that Oster had intentionally doctored the sound on the recording to make plaintiff's helicopter seem noisier than it actually was, there is *no* evidence that defendants "solicited" him to do that, or that they knew or should have known that the sound was distorted or inaccurate.  Whether the audio portion of the recording is accurate, then, is irrelevant to plaintiff's claims against the defendants.[23]

### III. Plaintiff's Motion to for Leave to Amend the Complaint

Plaintiff has cross-moved to amend his complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure (Dkt. #13).  Specifically, plaintiff seeks to add additional factual allegations in support of his claims of discrimination and retaliation, and to add a claim for

---

[23]Particularly when making an allegation as serious as one involving the knowing solicitation of falsified evidence, then, plaintiff and his counsel would be well advised to take greater care to see to it that their own factual contentions that they make before this Court have evidentiary support.  *See* Fed. R. Civ. P. 11(b)(3).

punitive damages against Nesbitt.

Leave to amend a complaint should be freely given when justice so requires.  Fed. R. Civ. P. 15(a).  However, "it is well established that leave to amend a complaint need not be granted when amendment would be futile."  *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).  An amendment would be futile if it could not withstand a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6).  *See Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 604 (2d  Cir. 2005) ("In addressing the proposed futility of an amendment, the proper inquiry is comparable to that required upon a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)") (internal quotation marks omitted); *accord Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

None of the proposed amendments to plaintiff's complaint pass that test.  With respect to plaintiff's discrimination claims, many of the allegations that plaintiff seeks to add to the complaint (*e.g.*, D'Amico's having "heard things ... about the Town disliking Italians") have been addressed above.  There are some additional allegations in plaintiff's proposed amended complaint, but they are, if possible, even weaker.  For example, plaintiff seeks to add an allegation that prior to the filing of the instant lawsuit, the Town was served with an administratively-filed charge "alleging that an Italian American was not hired by the town due to his nationality; that charge indicates that Town officials refer to Italians as 'dagos' 'wops' et cetera." Dkt. #13-4 ¶¶  86, 100.  There is no allegation or indication of who made these allegations, when they were made, who was alleged to have made those ethnic slurs, the circumstances under which they were made, or what the outcome of the administrative charge

was.  In short, this unattributed, naked allegation is about as probative as a piece of graffiti.[24]

Plaintiff also seeks to amend the complaint to allege certain statements that Nesbitt made in the news media denying plaintiff's allegations of prejudice against Italian Americans.  Plaintiff would allege that Nesbitt's statements "are belied by the record," because when they were made, the Town had "recently settled" Collichio's lawsuit against the Town.  Dkt. #13-4 ¶ 100.  The facts that the terms of that settlement were not made public, and that there is no indication that the Town admitted any wrongdoing in connection with that suit, seem not to trouble plaintiff, nor does the general inadmissibility of such evidence.  *See* F.R.E. 408(a) (generally prohibiting admission of evidence relating to a party's compromise, or offer to compromise, a claim, in order to prove liability for the claim).

Under the proposed amendment, Nesbitt's public statements about plaintiff's allegations in this lawsuit would also be added to the complaint to bolster plaintiff's allegations of unlawful retaliation.  Even giving these allegations a generous construction, however, it is difficult to see how they are probative of retaliation.  Plaintiff's reasoning, apparently, is that since Nesbitt–according to plaintiff–knew that plaintiff's allegations of discrimination by the Town against Italian Americans were true, Nesbitt's public denial of those allegations constituted "retaliation" against plaintiff.

This "evidence" does not tend to establish any element of plaintiff's First Amendment retaliation claim.  Nesbitt's statements about plaintiff's allegations are entirely unremarkable, and by no reasonable stretch of logic or inference could they be viewed as "retaliation."  All that

---

[24]Even if the speaker were identified, I do not believe that such evidence would be admissible in this action.  *See Bliss v. Rochester City School District*, 196 F.Supp.2d 314, 326-31 (W.D.N.Y. 2002) (evidence relating to claims of discrimination made by other individuals in other, unrelated lawsuits against the same defendant "ha[d] no bearing whatsoever" on plaintiff's claims of race discrimination).

Nesbitt did was to exercise his own First Amendment right by publicly denying the serious accusations that plaintiff had made against him. *See X-Men Security, Inc. V. Pataki*, 196 F.3d 56, 70 (2d Cir. 1999) ("No case which we are aware has recognized a right in any individual under the First Amendment or the Equal Protection Clause, or any other constitutional provision, to prevent legislators from exercising their rights merely to express their views"); *Doe v. Green*, 593 F.Supp.2d 523, 536-38 and n.14 (W.D.N.Y. 2009) (police union president's public statements opining that police officers had committed no wrongdoing in connection with events giving rise to plaintiffs' civil rights suit against city could not be considered objectively false, and even if they were false, they did not give rise to any constitutional claim, and "were themselves protected by the First Amendment").

Plaintiff also seeks to add an allegation concerning a newspaper op-ed piece authored by Nesbitt, in which he referred to plaintiff's claims of discrimination as "unsubstantiated." Proposed Amended Complaint (Dkt. #13-4) ¶ 101. Plaintiff alleges that this statement "improperly leads the reading audience to believe there has been a court decision regarding [plaintiff's] assertions and is patently false since no court decision has been rendered to date regarding [plaintiff's] federal lawsuit." *Id.*

To read Nesbitt's use of the adjective "unsubstantiated" as implying that the Court had issued a decision adverse to plaintiff is illogical and unreasonable. All that the term "unsubstantiated" could reasonably be taken to mean, in the context of Nesbitt's statement, is that plaintiff's allegations had not been proven, or that they were not supported by the facts, which was certainly an apt description of plaintiff's claims. *See* Webster's Third New International Dictionary, Unabridged at 2512 (1981) (defining "unsubstantiated" as "not supported or borne out by fact"). Again, this was nothing more than Nesbitt's statement of his

opinion about a matter of public concern.

The proposed amended complaint also alleges that on one occasion, Nesbitt stated, in response to a suggestion by a Board member that the Town settle the instant lawsuit in order to save the taxpayers money, that Nesbitt "d[id]n't care what it costs" and that he was "not going to let Casciani get away with this!" Dkt. #13-4 ¶ 93. If anything, this statement suggests only that Nesbitt was incensed at what he believed to be utterly baseless allegations that plaintiff had made against him. In no event could it reasonably be interpreted to suggest an intent to retaliate against plaintiff for having exercised his First Amendment rights.

Finally, plaintiff seeks to add a claim for punitive damages against Nesbitt. Since all of plaintiff's substantive claims fail as a matter of law, there is no basis for a punitive-damages claim against Nesbitt.[25]

**CONCLUSION**

Defendants' motion to dismiss (Dkt. #10), which the Court has converted to a motion for summary judgment, is granted, and the complaint is dismissed.

---

[25]I also note that the proposed claim for punitive damages names Nesbitt in both his individual and official capacities. *See* Dkt. #13-4 at 28. Punitive damages are not available against municipal officers sued in their official capacity. *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 262 (2d Cir.) (citing *Brandon v. Holt*, 469 U.S. 464, 471-73 (1985)), *cert. denied*, 520 U.S. 1211 (1997).

This proposed claim also alleges that "[p]unitive damages are justified against Officer Romano ... ." Dkt. #13-4 ¶ 134. There do not appear to be any allegations concerning anyone by that name in this lawsuit, however, and the Court assumes that this sole reference to "Officer Romano" is due to a clerical oversight.

Plaintiff's cross-motion for leave to amend the complaint (Dkt. #13) is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
October 6, 2009.